Heinz Binder (SBN 87908)
Wendy Watrous Smith (SBN 133887)
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
T: (408) 295-1700
F: (408) 295-1531
Email: heinz@bindermalter.com
Email: wendy@bindermalter.com

Attorneys for Defendant JRG Attorneys at Law
(named in Complaint as Johnson, Rovella, Retterer,
Rosenthal & Gilles, LLP)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>ROBERT BROWER, SR.,<br><br>             Debtor. | Case No.   15-BK-50801-MEH<br><br>Chapter 11<br><br>Adv. No.:  21-ap-05029-MEH |
| MICHAEL G. KASOLAS, solely in his capacity as the Liquidating Trustee for the Robert Brower, Sr. Liquidating Trust,<br><br>       Plaintiff,<br><br>v.<br><br>PATRICIA BROWER, solely as the trustee of the BROWER TRUST (2015), dated June 30, 2015, et al. | Date:     November 18, 2021<br>Time:    11:00 a.m.<br>Judge:   M. Elaine Hammond |

## REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)

Pursuant to Federal Rule of Evidence 201, Defendant JRG Attorneys at Law, LLP ("JRG Attorneys") hereby requests that the Court take judicial notice of the following documents in support of its Motion to Dismiss Complaint Pursuant to Rule 12(b).

REQUEST FOR JUDICIAL NOTICE ISO MOTION TO DISMISS

A. Transcript of Proceedings: a) Status Conference; b) Hearing re: Confirmation of the Second Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement Dated August 17, 2017 filed by MUFG Union Bank; c) Objection Filed by Debtor; and d) Objection filed by Campeau Goodsell Smith, LLC, November 2, 2017.

B. Transcript of Proceedings, Debtor's Motion to Sell Property, November 12, 2015. Bankruptcy Doc. #244.

Dated: September 29, 2021            BINDER & MALTER, LLP


                                    By: /s/ *Wendy Watrous Smith*
                                        Wendy Watrous Smith
                                        Attorneys for JRG Attorneys at Law

REQUEST FOR JUDICIAL NOTICE ISO MOTION TO DISMISS

# EXHIBIT A

```
1              UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                   (SAN JOSE DIVISION

4   In re:

5   ROBERT S. BROWER. SR.,           Case No. 15-50801

6                                    Chapter 11

7                                    San Jose, California
                                     November 2, 2017
8                                    10:48 a.m.
              Debtor.
9   _____/

10                  TRANSCRIPT OF PROCEEDINGS
                     a) STATUS CONFERENCE
11      b) HEARING RE: CONFIRMATION OF THE SECOND AMENDED
         COMBINED CHAPTER 11 PLAN OF REORGANIZATION AND
12        DISCLOSURE STATEMENT DATED AUGUST 17, 2017
                    FILED BY MUFG UNION BANK
13               c) OBJECTION FILED BY DEBTOR
       d) OBJECTION FILED BY CAMPEAU GOODSELL SMITH, LLC
14
                BEFORE THE HONORABLE M. ELAINE HAMMOND
15                UNITED STATES BANKRUPTCY JUDGE

16  APPEARANCES:

17  For the Debtor:          JAURIGUE LAW GROUP
                             BY: RYAN STUBBE, ESQ.
18                           300 W. Glenoaks Blvd. Suite 300
                             Glendale, California 91202
19

20  For Campeau Goodsell     CAMPEAU, GOODSELL and SMITH
    Smith:                   BY: WILLIAM J. HEALY, ESQ.
21                           440 North 1st Street #100
                             San Jose, California 95112
22

23  For MUFG Union Bank:     SHEPPARD MULLIN RICHTER & HAMPTON
                             BY: MICHAEL LAUTER, ESQ.
24                           Four Embarcadero Center 17th Floor
                             San Francisco, California 94111
25
```

```
 1   APPEARANCES (CONTINUED):

 2
     Also Present:              ROBERT BROWER, SR.
 3

 4   Court Recorder:            RON ROMBAWA
                                UNITED STATES BANKRUPTCY COURT
 5                              280 South First Street
                                San Jose, California 95113
 6

 7   Transcription Service:     Jo McCall
                                Electronic Court
 8                              Recording/Transcribing
                                2868 E. Clifton Court
 9                              Gilbert, Arizona 85295
                                Telephone: (480) 361-3790
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

November 2, 2017                    10:48 a.m.

-oOo-

COURTROOM DEPUTY: Calling Line Item No. 6, <u>Robert Brower, Sr,</u>

MR. LAUTER: Good morning, Your Honor, Michael Lauter of Sheppard Mullin for creditor and Plan proponent, MUFG Union Bank.

MR. STUBBE: Good morning, Your Honor, Ryan Stubbe appearing on behalf of the Debtor, who is present in court.

THE COURT: Mr. Stubbe, why isn't your firm employed yet?

MR. STUBBE: We have to set our employment application for hearing, so we -- you know, I'll be able to do that today. I anticipate filing the notice of hearing on that, Your Honor.

THE COURT: Okay. It's been pending for a while

MR. STUBBE: Yes, it has, Your Honor.

THE COURT: Okay.

MR. HEALY: And William Healy for Campeau Goodsell Smith, Your Honor.

THE COURT: Okay. All right. So this is the hearing on confirmation of the Plan. I saw that there were two objections filed by Mr. Brower, the Debtor, and by Campeau Goodsell Smith. I did see also that there was

1  obviously the continuance and then attached to the

2  Memorandum of Points and Authorities is a proposed Third

3  Amended Plan addressing a number of -- particularly the

4  technical issues.  What are the objecting parties still

5  raising?

6         MR. LAUTER: Well, Your Honor, we had a meet and

7  confer yesterday --

8         THE COURT: M-hm.

9         MR. LAUTER: -- Mr. Stubbe, Mr. Healy and I.  We

10 went over the objections that were made and the proposed

11 amendments to the Plan and whether or not they resolved

12 them.  So I think they're all resolved, and Mr. Healy and

13 Mr. Stubbe could correct me if I'm wrong, but except for

14 two -- one of them is the issue about the effective date

15 being illusory, allegedly illusory --

16         THE COURT: M-hm.

17         MR. LAUTER:  -- and not fixed.  And the other is

18 more of an issue between, as I see it, Mr. Stubbe and Mr.

19 Healy about whether or not the claim of Mr. Healy's firm

20 for the professional fees from the non-dischargeability

21 case should be discharged.  Those are the only two issues,

22 I think.

23         MR. STUBBE: That's correct, Your Honor.

24         THE COURT: Okay.

25         MR. HEALY: I think there's a third.  It's more of

1  on the good faith; it's 5(c) and (d).  It's in the Plan,

2  notice is that the bank, Union Bank, has a State Court

3  litigation against -- and a judgment against Chateau

4  Julian, and it's now trying to make Great American Wineries

5  a successor in interest.  And we had objected that that

6  presents a conflict because Union Bank is pursuing Coastal

7  in the enhancement action, and because there's a financial

8  relationship between Great American and Coastal, which is a

9  loan by Coastal to Great American of 1.2 million, the bank

10  is not only shooting holes in two buckets at the same time,

11  but they can pick which bucket they want to go after, and

12  if the bank is successful in its own successor liability

13  theory and ends Great American Winery, now Coastal has no

14  recovery.  Therefore, the estate -- I saw that as a

15  conflict.  That's the argument that I didn't agree really

16  resolved yesterday --

17          THE COURT: Okay.

18          MR. HEALY:  -- in addition to the effective date.

19          MR. LAUTER: We did discuss that yesterday, and I

20  wasn't sure if it was resolved.  But now I know it is not.

21          (Laughter.)

22          THE COURT: Okay.  All right.  So I will -- okay.

23  Which order do you want to take them in?

24          MR. LAUTER: I think we should take the effective

25  date issue first.

1          THE COURT: Okay.

2          MR. LAUTER: Now that, Your Honor, the Debtor did

3  cite a few cases.  I think if you look at the one that

4  discusses in greatest detail, which is the Central European

5  Industrial Development case by Judge Montali from 2003 --

6          THE COURT: M-hm.

7          MR. LAUTER: It talks about --

8          THE COURT: Isn't that the one you cited?

9          MR. LAUTER: I think we both cited it.

10          THE COURT: Okay, got it.

11          MR. LAUTER: Yeah.

12          THE COURT: All right.

13          MR. LAUTER: It talks about whether or not there's

14  any prejudice and whether --

15          THE COURT: And the shifting of the risk.

16          MR. LAUTER: Yeah, exactly.  And then whether or

17  not there is a contingency for the Plan to go effective,

18  and I think if you look at the cases cited around that, the

19  contingency cases are about -- involve Plans where the Plan

20  will not go effective unless the Debtor or the Plan

21  proponent is successful in its litigation.

22          Here, as we pointed out, the values as described

23  by the Debtor to the assets he is admitting to have and the

24  expected administrative claims, the Plan will easily be

25  able to go effective even if Union Bank is unsuccessful in

1  the estate enhancement action.

2          As to prejudice --

3          THE COURT: Because you at least have enough to

4  pay the administrative claims.

5          MR. LAUTER: Exactly.

6          THE COURT: And there's not much left that will go

7  to anywhere else.

8          MR. LAUTER: That's right.

9          THE COURT: Okay.

10          MR. LAUTER: As to prejudice to the creditors, the

11  Plan is the fastest way to get payment to creditors in this

12  case.  It's a liquidation.  If we deny confirmation of the

13  Plan, it will just kind of put us back at square one and

14  elongate an already long process for creditors to get paid.

15  So I don't see prejudice to creditors in this case,

16  especially considering how long it's been going on and the

17  absence of another alternative on the table.

18          THE COURT: Okay.

19          MR LAUTER: That's my point on the effective date

20  issue.

21          THE COURT: Okay.  Mr. Stubbe or Mr. Healy, who

22  wants to go first?

23          MR. STUBBE: Thank you, Your Honor.  So to address

24  the first argument, this idea that, you know, even if the

25  estate enhancement action is unsuccessful, there's still

1  going to be enough to pay the administrative claims, we

2  don't believe there's sufficient evidence in front of the

3  Court for the Court to make a finding as to the value of

4  the Debtor's 24 percent interest, you know, today or in the

5  future.

6  The bank is citing a sale motion which was filed

7  in 2015, subsequently withdrawn, and we just don't feel

8  that's sufficient evidence to establish the value today or

9  in the future for that 24 percent interest.  You know, it's

10 a privately -- it's a minority interest in a privately held

11 company.  It's embroiled in litigation, subject to all

12 sorts of --

13 THE COURT: So I understand that argument.  The

14 problem I had with your pleading that I couldn't figure out

15 is the way the analysis works is it may not be -- it may be

16 illusory or not appropriate or not confirmable if there

17 is -- the risk is being shifted to the claimants.  What

18 risk is being shifted to the claimants here, because I

19 don't see any other one -- anyone else offering to pay them

20 anything.

21 MR. STUBBE: Well, we see two distinct issues

22 here.  One is the feasibility analysis in itself, and the

23 other is this idea of shifting risks to claimants.  And,

24 you know, I think both have their own issues, but I guess

25 what the Court is getting at is what is the alternative if

1  this Plan isn't --

2          THE COURT: So let me actually back up.  At this

3  point, and you all know the numbers better than I do, I

4  know CGS has an administrative claim somewhere in the

5  150,000 -- somewhere between 150 to 200,000 in this case.

6          MR. HEALY: No, it's close to a hundred thousand.

7          THE COURT: Okay, a hundred thousand.

8          MR. HEALY: 105 or some number like that.

9          THE COURT: Okay. So there's 105 for CGS.  MUFG is

10 probably going to file one, but has not.

11         MR. LAUTER: It depends on how things get --

12         THE COURT: Obviously.  What other administrative

13 claims are there in this case?

14         MR. STUBBE: Well, we would estimate a small -- a

15 relatively small administrative claims for our firm, but

16 that is, you know, essentially the universe of

17 administrative claims.

18         THE COURT: So to go effective, it's only 125,000,

19 roughly.

20         MR. STUBBE: Yeah.  I mean the estimate in the

21 Plan is 150,000 in administrative claims to go effective.

22         THE COURT: Okay.

23         MR. STUBBE: That's true, Your Honor.  The problem

24 is, I don't think there's evidence that we can even pass

25 that hurdle.

1          THE COURT: But -- so the problem -- so the issue

2  is that -- I mean there's evidence plenty before me in this

3  case that Coastal Cypress is the entity that owned the real

4  property, sold it, and acquired money for it.  So it's got

5  cash.  Cash has value.  I can't remember the exact number.

6  It seems like they sold it for -- they got seven and a half

7  million; is that about right?  Twelve?

8          MR. LAUTER: Twelve million was the sales price.

9  I think seven something was the net proceeds.

10          THE COURT: I'm sorry.  Seven and a half million

11  times 24 percent is 1.8 million, so how you're not getting

12  to 150,000, I don't know.

13          MR. STUBBE: If that cash was just frozen in time,

14  we wouldn't have any issues, Your Honor, but --

15          THE COURT: So what is the status of that cash?

16          MR. STUBBE: Well, frankly, I don't have like a

17  current status as to --

18          THE COURT: Well, what happened to it?

19          MR. STUBBE: Well --

20          THE COURT: Is Coastal Cypress still holding those

21  funds?

22          MR. STUBBE: A portion of the funds, yes, Your

23  Honor.

24          THE COURT: What portion?

25          MR. STUBBE: I don't have the exact amount.

THE COURT: How much?  This isn't rocket science.

I mean this is your argument, that Coastal Cypress doesn't

have value sufficient for this Plan to go effective.

MR. STUBBE: Well, frankly, Your Honor, we feel

that it's the Plan proponents' burden --

THE COURT: So wait a minute.  You're telling me

that -- are you telling me that Coastal Cypress has 24

percent of whatever Coastal Cypress is holding would be

less than 150,000?

MR. STUBBE: Potentially, yes.  I mean the bank's

own pleadings have acknowledged that the proceeds realized

from the sale have diminished faster than anticipated.

THE COURT: How does cash diminish faster than

anticipated?  You either make incredibly poor investments

or you pass it somewhere else.  I mean we're not talking --

this isn't complicated.  It's money.

MR. STUBBE: I think the fundamental issue from

our perspective is that we don't have evidence of what, you

know, what are the proceeds on hand right now, but that's

not our burden to bear.  We're not the Plan proponent here.

We don't have to present evidence to the Court that, you

know, here's the current state of affairs.  Here's what we

project, you know, might be the state of affairs on the

effective date.  That's not our burden to produce that

evidence, and that's the Plan proponents' burden, and that

1  has not been met here.  We don't know how much is in

2  Coastal as of today.  We don't know how much will be

3  there --

4          THE COURT: It's somewhat facetious for you to

5  make that argument.

6          MR. STUBBE: You know, frankly --

7          THE COURT: So here's the deal.  You could easily

8  make your argument by handing me a bank statement of the

9  funds held by Coastal Cypress saying they haven't met it.

10 You didn't do that.

11         MR. STUBBE: I mean, we have -- we don't

12 necessarily have like a bank statement; but we -- the

13 Debtor did have a valuation prepared.

14         THE COURT: Is it under somebody's mattress?

15         MR. STUBBE: Well, we could obtain that

16 documentation for the Court.  Again, we don't feel it's our

17 burden to, you know, prove the amount that will be

18 available, since we're not the Plan proponent.  As far as

19 evidence of the Debtor's 24 percent interest, we did have a

20 valuation report prepared.  It does indicate a

21 substantially lower value than is indicated in the Plan.

22 You know, we're talking maybe 200 as of the date that the

23 valuation --

24         THE COURT: Wait a minute.  Wait a minute.

25         MR. STUBBE: $200,000 or so, a little bit over

1  that, for the Debtor's 24 percent interest.

2          THE COURT: Okay. Well, that's still over

3  150,000.

4          MR. STUBBE: It's over 150. That was when the

5  valuation report was prepared, and --

6          THE COURT: I'm sorry. I apologize if this was

7  attached to your objection and I missed it.

8          MR. STUBBE: No, it was not, Your Honor.

9          THE COURT: Okay.

10         MR. STUBBE: But again, you know, we just feel

11 that the bank -- it's the bank's duty to provide evidence

12 of the valuation, you know, in order to establish

13 feasibility and the other valuation elements of

14 confirmation. But to draw back, you know that -- what

15 we're talking about with this effective date is a date far

16 off in the future as well, an uncertain date, and, you

17 know, even if that is the value today, which the Court

18 doesn't have evidence of what that value is as of today in

19 front of it, it's going to be subject to risk, and that may

20 not be the value when the effective date comes around. And

21 that's the date that's relevant for the Court's analysis

22 here.

23         And, you know, we feel that is the Plan

24 proponents' burden to satisfy the elements of confirmation,

25 and we don't feel there's an evidentiary record in front of

1  the Court that would enable the Court to make those

2  required factual findings.

3      THE COURT: Okay.  So you haven't -- okay.  So

4  that I understand is your argument about valuation and

5  whether feasibility -- you haven't answered my question

6  about what's the risk that's being shifted.

7      MR. STUBBE: Well, the -- you know, there are

8  alternatives to this Plan.  One is that we could have --

9      THE COURT: What are they?

10     MR. STUBBE: I mean, for example --

11     THE COURT: I'm sorry, I cut off.  You were

12  getting ready to state them.  Okay.

13     MR. STUBBE: For example, one of the issues that

14  we stated with respect to this Plan is that it ties the

15  hands of the liquidating trustee with respect to the

16  ability to sell or settle the estate's causes of action.

17  Another potential avenue is to kind of liquidate the estate

18  in a piecemeal approach, maybe liquidate the 24 percent

19  interest now and allow the estate enhancement --

20     THE COURT: So but the Debtor tried to do that and

21  withdrew the motion twice.

22     MR. STUBBE: That's correct, Your Honor.  I don't

23  necessarily think that precludes that from being able to

24  either -- you know, either the Debtor could bring that

25  motion again or, you know --

1          THE COURT: Nothing has stopped the Debtor from

2   bringing that motion.

3          MR. STUBBE: That's true.  All I'm suggesting here

4   is that there are alternatives that could address --

5          THE COURT: No, I'm asking what is the risk that

6   is being shifted.

7          MR. STUBBE: And the risk is the delay of the

8   effectiveness.  So the risk is that that 24 percent --

9          THE COURT: So -- okay.  So the risk is the delay.

10          MR. STUBBE: M-hm.

11          THE COURT: What is the option on the table that's

12   immediate, because I don't see one.

13          MR. STUBBE: One would be to give the liquidating

14   trustee immediate power to dispose of, you know, either the

15   24 percent interest or settle or sell the estate's causes

16   of action.  I don't see any need to kind of tie the

17   liquidating trustee's hands with respect to those issues.

18   There's a way to liquidate the estate faster than is being

19   proposed in the Plan.

20          THE COURT: So why aren't you proposing that Plan?

21          MR. STUBBE: Well, we -- I mean we would be happy

22   to work with the bank to address that issue.  You know,

23   obviously that's something that we raised in our pleadings.

24          THE COURT: You don't have to work with the bank

25   on anything.  You can propose a Plan.

1        MR. STUBBE: Well, given the claims in this case,

2   we can't obtain the votes sufficient for confirmation in

3   the absence of the bank's vote.

4        THE COURT: True.

5        MR. STUBBE: So that's obviously a preventative

6   mechanism and why we would need to work with the bank.

7        THE COURT: Why you may need to come up with more

8   money to work with the bank.  I mean --

9        MR. STUBBE: I'm sorry.  I maybe don't understand

10  the Court's point there.

11       THE COURT: My -- never mind.  It's not a

12  necessary point.  Go on.

13       MR. STUBBE: And, you know, additional

14  alternatives solely within the bank's power, the bank could

15  inject capital into the estate, pay the administrative

16  claims, let it go effective now and just, you know, finish

17  their estate enhancement action.  I'm sure they're

18  unwilling to do that, and that's something that we

19  discussed during our meet and confer, but the underlying

20  point, I think, is that there are alternatives that would

21  expedite the liquidation of the estate, and I think that

22  the cases make clear that when you delay the effectiveness

23  of the Plan beyond the reasonable period for liquidation,

24  that denial of confirmation of the Plan is appropriate in

25  those circumstances.

1          THE COURT: Okay.  All right.  Mr. Healy, do you

2     wish to be heard on this point?

3          MR. HEALY: Briefly, Your Honor.  Thank you.  Just

4     that the Court suggested or inquired about some options,

5     and I think the first option obviously is to convert this

6     case and let a trustee do what trustees do every day.  They

7     can piecemeal the assets; they can piecemeal the

8     litigation.  They obviously can do whatever they think is

9     in the best interest of all the creditors.

10          The other option is to -- if the Court wants to

11     approve the Plan is to make the effective date a hard date,

12     for example, 90 days, so that this case actually gets

13     somewhere, and at the end of 90 days, the Court can revisit

14     conversion.  But -- the third option that I think Mr.

15     Stubbe indicated was someone to inject some money in there

16     and pay off the administrative claims.  The problem we have

17     with the administrative claims is, there's actually hours

18     which I just looked in the Plan; it says 102 as a round

19     number.  I don't know about the Debtor's projected thing,

20     but there's also two potential administrative claims from

21     the bank.  Number one is for the Plan, and the second --

22     secondarily is the enhancement action.  And both of those

23     claims deadlines with respect to Union Bank are after the

24     effective date.

25          So it's going to be a lot of guesswork by any

1   trustee to figure out how much do I settle for or how much

2   do I have to collect if he doesn't even know what the

3   administrative claims are, the two from Union Bank.  So

4   that's why -- that's another reason.  Our main argument is

5   we don't think there is really an effective date that can

6   ever happen.  It's probably never going to happen, and

7   there's no way for me to sit down and talk to a third party

8   and explain to him when it may happen.  It could be

9   tomorrow, and it could be five years from now.

10          THE COURT: What third party are you talking to?

11          MR. HEALY: Any third party on the planet.  I mean

12  you can't just take this Plan and tell somebody when things

13  are going to happen because we never know what's going to

14  happen.  Even if this Court held a trial next week, then

15  there has to be a ruling; then there has to be collection,

16  sufficient collection to cover the known administrative

17  claims, the anticipated administrative claims from Union

18  Bank, and collection is going to be a huge issue when Union

19  Bank is simultaneously attacking -- I'm not criticizing

20  them -- attacking Great American Wineries which owes

21  Coastal 1.2 million, which obviously impacts the potential

22  recovery.

23          And the risk, unfortunately, falls on Campeau

24  Goodsell Smith as administrative claimant.  We're going to

25  sit here and wait and wait and wait, and we don't know how

1 much money will be wasted away from Coastal defending

2 itself in one action.  Obviously Great American affects

3 Coastal.

4          THE COURT: So why is Coastal Cypress funding

5 Great American litigation?

6          MR. HEALY: I don't think that's the way --

7          THE COURT: I may have misunderstood what you

8 said.

9          MR. HEALY: Yes.  There's testimony back in --

10 that in 2015 Coastal lent Great American Wineries a total

11 of 1.2 million, and I don't know if it's paid back or not.

12 I have no idea, but I believe that comes off the total

13 which Mr. Stubbe may be unfamiliar with.  Mr. Brower, when

14 we represented him, made two motions to sell, one at 2.54 a

15 share and one at 1.95.  What I copied yesterday off of my

16 notes is that just in round numbers, there is 1.87 million

17 held by Coastal at that time, so you multiply that out by

18 1.95, in Mr. Brower's 24 percent, and you get the 448,000.

19          If that's there, it would be a miracle.  But the

20 risk is all -- just landed on Campeau Goodsell Smith.  We'd

21 like obviously to get paid and get out, and I can't force

22 Union Bank to step in.  It would be nice if they did, but I

23 can't force them.  And I just don't see the effective date

24 ever happening, especially if the bank is successful

25 against Great American Wineries.  Why would they then

1  prosecute this lawsuit?  They'd just abandon it.  I mean I

2  would.

3       THE COURT: Okay.  Mr. Lauter, your response?

4       MR. LAUTER: Sure.  When Mr. Stubbe was talking

5  about feasibility, I think what's important to keep in mind

6  is that the standard is not that we have to show that it's

7  certain that the Plan will be successful, but that there's

8  a reasonable likelihood of success.  And what we use to do

9  that is we used the value that the Debtor himself had

10 described as the president of Coastal to his admitted

11 interest in Coastal Cypress.  I've never heard of another

12 valuation.  I never heard of what Mr. Healy was describing.

13 The only thing in the record in the case is -- well,

14 there's two sale motions, the most recent one is the

15 450,000 number, which is greatly in excess of the estimated

16 150,000 in administrative claims.

17       So I think just based on that, we've met our

18 burden.  To the extent that the Debtor wants to argue

19 against it based on value in Coastal, he's the president of

20 Coastal and could print out a base statement and say what

21 the value is or, you know, make an argument, but he hasn't

22 does so, and so I haven't rebutted what the evidence shows.

23       As to what Mr. Healy was arguing about, I think

24 that it's answered by the same standard here for

25 feasibility.  There's some uncertainty obviously because

1  they're tied up in litigation.  There's nothing in the

2  record in this proceeding about the loans from Coastal to

3  JAW, and I can't, as I sit here today, describe exactly

4  what they are, but other than that, some discovery has

5  shown that there are some loans in some amount from Coastal

6  to JAW.

7       So, you know, the estate itself doesn't have a

8  direct cause of action against JAW.  Union Bank has a

9  judgment against Chateau Julian, and so it's pursuing JAW

10  as the alter ego, so -- we've disclosed that in the Plan

11  and Disclosure Statement.

12       The last thing I'd like to note is that the only

13  people not in the room who have a financial interest in the

14  case have all voted in favor of the Plan.  The creditor

15  vote was unanimous.

16       THE COURT: Okay.  All right.  Let's take --

17       MR. LAUTER: Except for Mr. Brower.  He did not

18  vote.

19       THE COURT: Who did not vote.

20       MR. LAUTER: Yeah.

21       THE COURT: Okay.  All right.  Let's take the

22  second issue then.  Did we address your issue about Great

23  America being pursued separately in that, Mr. Healy, or do

24  you want more on that?

25       MR. HEALY: Just briefly, I put in our opposition,

1  I think Mr. Lauter is wrong that the estate, to the extent

2  that Great American Wineries is the successor in interest

3  to Chateau Julian, Mr. Brower guaranteed Chateau Julian's

4  debt.  Then Great American –– the estate could knock on

5  Great American Wineries' door and say, we want you to pay

6  the debt of Chateau Julian, which Mr. Brower guaranteed.

7  It's basically a subrogation or contribution argument by

8  Mr. Brower against Great American Wineries.

9         THE COURT: I'm sorry.  You lost me there.  Mr.

10  Brower guaranteed Great American Wineries' debt?

11         MR. HEALY: Mr. Brower is the guarantor of Chateau

12  Julian's debt.

13         THE COURT: Right.  That I recall.

14         MR. HEALY: And the argument by Union Bank in

15  State Court is that Great American Wineries is successor in

16  interest to Chateau Julian.  If that's true, then the

17  estate, stepping into Mr. Brower's shoes, has a direct

18  argument to Great American Wineries for contribution or ––

19  it's either contribution or subrogation.

20         THE COURT: So you're basically arguing that the

21  estate can have the same rights as the bank to pursue Great

22  American Wineries.

23         MR. HEALY: That is correct, Your Honor.

24         THE COURT: Okay.  I think at this point this is a

25  hypothetical argument, and if there is a settlement or

1  resolution reached, nothing we do today precludes these

2  issues from being raised when there are subsequent

3  developments. You're now basically three steps into

4  litigation that hasn't -- that at least -- frankly, all I

5  know is the adversary proceeding that's before me, and

6  you've mentioned that there's a pending litigation against

7  Great American Wineries, but until there's something

8  that -- there's a resolution in either one of them that

9  calls the question as to whether there's some share for the

10  estate that's being taken away otherwise, I don't think

11  there's anything I can do with it at this point.

12  Litigation always has certain unknowns to it.

13          MR. HEALY: I appreciate that, Your Honor.

14          THE COURT: But I don't think if there is a

15  conflict that's seen to arise, it precludes that from being

16  raised at the point where there is the conflict or a

17  potential conflict. Okay. All right.

18          And then -- so the remaining issue is the --

19  whether Campeau Goodsell's attorney's fees claim for

20  pursuing the -- for representing Mr. Brower in the

21  adversary proceeding should be discharged. What's the

22  argument as to why it should be discharged?

23          MR. STUBBE: The argument is just based on the

24  language of 1141(d), which provides that pre-confirmation

25  debts are typically discharged and --

1        THE COURT: How is this a pre-confirmation debt?

2        MR. STUBBE: Well, it's a claim against Mr. Brower

3    that arose prior to confirmation, and so we feel that falls

4    within the statutory definition of, you know, a debt

5    that's a pre-confirmation debt -- for right to payment.

6        THE COURT: Mr. Healy?

7        MR. HEALY: Our position is it's obviously not a

8    pre-petition debt.

9        THE COURT: Wait a minute.  Are you talking pre-

10   petition or pre-confirmation?

11       MR. STUBBE: Pre-confirmation.  The language of

12   1141(d) says pre-confirmation.

13       THE COURT: Okay.

14       MR. HEALY: So our order of objections is, it's

15   clearly not a pre-petition debt; it's clearly a post-

16   petition obligation.  It's not a claim under the statute,

17   and it's clearly our agreement was and is in our prior

18   papers not an obligation of the estate; it's solely Mr.

19   Brower, and the prejudice to us is obvious that we don't

20   get to vote on the Plan; we're not even entitled to notice

21   under that Plan.  Clearly, we are aware of it, but we

22   didn't get notice in that capacity.  And it's fundamentally

23   not fair to us to be caught up in the Plan, and we -- the

24   proponent of the Plan has agreed to carve us out, for lack

25   of a better term, and that's consistent with 1141 which

 1   says "except as otherwise provided by the Plan" et cetera,

 2   et cetera.  It's a written opportunity to provide an

 3   exception to the language of that statute.

 4          THE COURT: Okay.  Let me look at the statute

 5   again.

 6          MR. LAUTER: Your Honor, I think it's just brought

 7   up by the sort of unusual situation that happened in which

 8   this Court issued an order approving the fees, but also

 9   stating that they're not claims against the estate.  If

10   they were claims against the estate, they'd be admin

11   claims; they would have to pay them.  I think what Mr.

12   Healy is referring to is, he's in some sort of weird limbo

13   where he doesn't get paid but he also gets discharged and

14   it seems unfair.

15          MR. HEALY: Without a vote.

16          THE COURT: Right.  Okay.  Give me a second.

17      (Pause.)

18          So, the Plan as originally drafted provided a

19   discharge for this debt.  Mr. Healy objected saying, for

20   the arguments he's raised, the bank modifies or is

21   proposing to amend the Plan to address that issue so that

22   it's not -- that debt is not discharged.  1141(d) says,

23   "except as otherwise provided in the Plan is discharged."

24   So what's your argument?

25          MR. STUBBE: Our position is that that phrase in

1  the statute is referring to the timing of the discharge,

2  so --

3            THE COURT: What's your authority for that?

4            MR. STUBBE: Well, the language of the statute is

5  saying, you know, unless as otherwise ordered, and this is

6  just from my memory, but, except as otherwise provided for

7  under the Plan, confirmation of the Plan discharges any

8  debt and so it's essentially a language analysis argument.

9  That statute is saying the Plan -- you know, confirmation

10 of the Plan discharges the Debtor unless the Plan provides

11 otherwise, and so we're interpreting that as the ability to

12 modify the timing of discharge.  Obviously it's very common

13 to --

14           THE COURT: I'm sorry.  Where are you getting the

15 timing -- so it's discharged unless the Plan provides

16 otherwise.  Where are you getting -- what are you pulling

17 from, either in the statute or case law that is referring

18 to the timing of discharge as opposed to whether it's

19 actually discharged?

20           MR. STUBBE: The clause, except as otherwise

21 provided for in the Plan, precedes confirmation of the

22 Plan, and so it's immediately preceding that clause, and

23 that's essentially a timing clause, you know, confirmation

24 of the Plan discharges --

25           THE COURT: Wait a minute.  Wait a minute.  So

1  except as otherwise provided in the Plan –- okay, continue.

2          MR. STUBBE: And so we –- I feel that that statute

3  is giving flexibility with respect to the timing of the

4  Debtor's discharge, but if we're looking for an exception

5  from discharge, that's going to be under, you know, 523 or

6  one of the other Code provisions that actually carves out a

7  debt from discharge.

8          THE COURT: Do you have any support for that

9  interpretation?

10          MR. STUBBE: Based on the case law?

11          THE COURT: Anything.

12          MR. STUBBE: Well, you know, I think it's in the

13  language of the statute, and frankly, I wasn't able to find

14  a case directly on point.  I didn't have a lot of time to

15  research the issue since it was, you know, only

16  interlineated into the most recent filing on October 26th.

17  So to be frank, Your Honor, no, I don't have any support

18  one way or the other, any guidance from the case law on

19  that issue.

20          THE COURT: Okay.  Give me a second.

21      (Pause.)

22          Okay.  I was just reading the comments to that

23  subsection.

24          MR. HEALY: If I could just follow up briefly,

25  Your Honor.  I disagree with Mr. Stubbe's attempt to

1  rewrite that statute.  There was an objection, and I

2  somewhat conferred with counsel that we actually did object

3  on a similar theme that the Plan called for discharge upon

4  confirmation as opposed to the actual performance.  I think

5  that's been addressed, so I don't think the timing argument

6  follows that statute or what's happened.

7         What I want to just note too, if that's really

8  the argument, that would wipe out the attorney's fees claim

9  by Mr. Stubbe's firm, both in their capacity as Debtor's

10 counsel and their capacity as the counsel in the adversary

11 proceeding for Mr. Brower.  I doubt that's fair in the

12 grand scheme of things to keep theirs in but knock ours

13 out, especially given the prior arguments.

14        MR. LAUTER: I don't have a scheme, Your Honor,

15 but it seems there's some due process issue with

16 discharging a debt that is not a debt of the estate.  I

17 think what 1141(d)(1)(A), when they talk about discharging

18 a debtor from any debt, I think it means any debt of the

19 estate.  I'm not sure why a non-estate debt would be

20 discharged.

21        MR. STUBBE: With respect to that issue, you know,

22 the discharge is entered with respect -- in an individual

23 case, it's discharging the individual's debts.  I think

24 that if we're going to give meaning to this idea of pre-

25 confirmation debt, you know, first we have to interpret

1  what the term "debt" means by looking at Section 101, and I

2  feel that encompasses CGS's, you know, adversary proceeding

3  fees and that they have a right to payment.  Section 101,

4  in defining debt doesn't refer to debts of the estate,

5  claims against the estate.  It's broadly defined as a right

6  to payment.  So for interpreting pre-confirmation debt, I

7  feel that the language of the statute does support that it

8  includes CGS's adversary proceeding fees.

9        And with respect to this concept that there's a

10 due process concern, you know, frankly, I think that this

11 was a risk that CGS should have known about.  You know,

12 they obviously took a risk in representing Mr. Brower when

13 there was a risk that they wouldn't be repaid, and frankly,

14 my firm is cognizant of that risk as well, and with respect

15 to -- you know, so I don't feel there's a due process

16 issue.  They should have known about this concern, just as

17 my firm is aware of that concern, and frankly, with respect

18 to the argument that, you know, our fees would be

19 discharged, well, that may be the case.

20       With respect to Mr. Brower personally, to the

21 extent that, you know, we don't have an administrative

22 claim for our fees, I think that is a fair position to

23 take, that our fees would be discharged, and that's why we

24 entered into agreements, you know, with third party payers

25 to try and account for that.  That's going to be in front

1  of Your Honor to, you know, review that and everything, but

2  that's a risk.  That's a risk that we took on getting into

3  this case.  That's a risk that CGS should have been aware

4  of in representing Mr. Brower, and I think that to give

5  effect to the language of the statute when we're talking

6  about pre-confirmation claims or pre-confirmation debts,

7  I'm sorry, it encompasses these sorts of situations.

8         THE COURT: Is there anything that requires a Plan

9  proponent to discharge a debt?

10        MR. STUBBE: Well, I think if, you know, for

11  example, if the Plan proponent was saying that the Debtor

12  is not entitled to a discharge at all, we would still be

13  objecting to that.  Obviously I would have been researching

14  that issue specifically.

15        THE COURT: But I'm talking about carving out a

16  specific debt.

17        MR. STUBBE: I'm not aware of any authority for

18  that.  I think it's pretty unusual.  You know, obviously

19  the way to except your claim from discharge is to file an

20  adversary proceeding, generally.  So I think that's the

21  appropriate mechanism, and to the extent that, you know,

22  you don't have a judgment that you're excepted from

23  discharge, I don't think it's appropriate for the Plan to

24  say, you know, too bad, Debtor; you're not getting a

25  discharge in this case because we say so --

1          THE COURT: Okay.

2          MR. STUBBE: -- with respect to, you know, any

3   specific debts or a discharge in general.

4          THE COURT: Okay.

5          MR LAUTER: For the record, Your Honor, we're sort

6   of agnostic as to whether it is -- I wasn't meaning it

7   because I wanted to resolve the objection, but I think I

8   created a new one.

9          THE COURT: Okay.

10         MR. LAUTER: To the extent it would hold things

11  up, you know, maybe the Plan could be confirmed, if it was

12  going to be confirmed.  Other than this, there could be

13  further proceeding on this issue, if necessary.

14         THE COURT: Okay.  Those are the three points

15  still in play, in essence.  I'm going to take a brief

16  recess to collect my thoughts, and I will return.

17         ALL COUNSEL: Thank you, Your Honor.

18       (Whereupon, a recess is taken at 11:29 a.m., and the

19  court is reconvened at 11:52 a.m.)

20         COURTROOM DEPUTY: Please rise.  The court is back

21  in session.

22         THE COURT: Please be seated.  Okay.  Thank you

23  all for your patience.

24         So I have done some additional research and

25  review of the pleadings, and I am prepared to rule at this

1   time.  My statements on the record constitute my findings

2   of fact and conclusions of law in accordance with Federal

3   Rule of Bankruptcy Procedure 7052.

4         As to the various -- so just for the record, the

5   Plan and Disclosure Statement were filed.  Objections were

6   filed by the Debtor and Campeau Goodsell.  The Plan

7   proponent, MUFG, has proposed, as attached to a Memorandum

8   of Points and Authorities, what would be a proposed Third

9   Amended Plan, addressing most of the issues identified in

10   those objections.  So the remaining issues are what have

11   been addressed here today.

12         I'll start with the feasibility argument asserted

13   by the Debtor.  There are approximately 150,000 in

14   administrative claims that will need to be paid under this

15   Plan on the effective date.  Administrative claims that may

16   be allowed after the effective date are not ones that can

17   be paid on the effective date, and so therefore are not a

18   requirement to being able to go effective.

19         So essentially, that 150,000 is what's required

20   for this Plan to be feasible.  The evidence in this case,

21   which has been proceeding for about two and a half years

22   before me and in which I have had numerous hearings in the

23   main case as well as a trial on non-dischargeability in a

24   related adversary proceeding, so it is a case where I have

25   a great deal of knowledge that's been provided in evidence

1   over the course of this case, is that Coastal Cypress,

2   which is a company in which the Debtor, Mr. Brower, is a 24

3   percent, at least, shareholder, and that he is the

4   president of Coastal Cypress.

5           Coastal Cypress is a holding company that didn't

6   actually have operations.  It owned real property in the

7   Carmel/Monterey area.  The funds obtained from the sale of

8   that property pre-bankruptcy were approximately seven and a

9   half million.  There is some indication that there is a

10  declining value of the money that is being held by Coastal

11  Cypress.  Again, it's not an operating entity, so this is a

12  company that's holding funds.  But there's no explanation

13  that's been provided in any of these proceedings as to why

14  or how such funds are being depleted.

15          The Debtor previously sought to sell his interest

16  on two different occasions and at the time would have

17  received approximately 450,000 for the estate.  This is the

18  evidence in support of the value of that asset that's been

19  provided by the objecting party in this case.  Thus, I find

20  it sufficient to establish that Mr. Brower's interest in

21  Coastal Cypress is at least 150,000.

22          To the extent the argument is that the Coastal

23  Cypress assets, again, money, have reduced to the point

24  that Mr. Brower's 24 percent interest is less than 150,000,

25  it's important to recognize that this argument is being

1  made by Mr. Brower, president of Coastal Cypress.  He could

2  easily have provided evidence of the assets of Coastal

3  Cypress, a bank statement, anything to that effect.  He has

4  not.  It is simply an argument that they haven't met their

5  presumption.  I find they have, and there's nothing before

6  me to rebut it.

7  As to the second argument which is related is

8  that the effective date itself is illusory.  The issue

9  isn't that the effective date is illusory; it's contingent

10 upon either recovery in the enforcement action or

11 determination that there's no ability to recover in the

12 enforcement action.

13 Courts have addressed this in numerous Plans and

14 have looked at it and found that where there's an

15 impermissible shifting of the risk to creditors, that too

16 long of a time period between confirmation and the

17 effective date may be grounds for denying confirmation.

18 Here, though, there is no showing of a change in risk to

19 the creditors, in part because there are no other options

20 that are before me or that have been presented to me in the

21 two plus years that this case has been proceeding.

22 There have been in the course of this case two

23 motions to approve the sale of the interest in Coastal

24 Cypress.  Both of those motions were withdrawn by the

25 Debtor.  The Debtor has never proposed a Plan.

1    All the creditors who voted to accept -- all

2  creditors who voted, voted to accept this Plan.  The Plan

3  is very clear that it is contingent upon litigation and

4  whatever recoveries may be obtained there.  Thus, I see no

5  real danger of changed facts or prejudice or more

6  precisely, I see that there is a chance of future change

7  that will increase the recovery to unsecured creditors,

8  whereas any other option would be next to nothing now.

9    So on that basis, I'm going to overrule the

10  argument that the effective date is illusory or too far

11  from the confirmation date.

12    As to the potential conflict with MUFG's pursuit

13  of Great American Wineries, as I said earlier in the

14  hearing, I believe this is a hypothetical issue at this

15  point.  If issues arise later, confirmation of this Plan

16  doesn't prejudice the pursuit of any valid argument on that

17  point.  So that's for the record.

18    The remaining issue is the discharge, whether the

19  CGS claim or Campeau Goodsell claim that it has incurred

20  for its representation of Mr. Brower, post-petition and

21  pre-confirmation.  The argument that's raised by Mr. Brower

22  is that Section 1141(d) language provides what is included

23  in a discharge and what is not included in a discharge.

24  The starting language is that, "except as otherwise

25  provided..." -- I'm omitting some points -- except as

 1  otherwise provided in the Plan, the following things are

 2  discharged or not.

 3          The argument by Mr. Brower is that this is a

 4  timing issue and that this -- that language is simply a

 5  timing issue and that the obligation, because it's pre-

 6  confirmation, must be included in the discharge that will

 7  be provided once the Plan is completed.  There's no

 8  authority for that argument provided here today, I don't

 9  actually find it to be a clear reading of the statute.

10          I also during the time that I was in recess

11  attempted to do some legal research on this point and was

12  unable to find any support for that argument.  So -- and

13  again, as a matter of equity, there also appears to be an

14  issue in discharging a debt of a creditor that was not

15  given an opportunity to vote on the Plan and wouldn't

16  otherwise have obtained notice but for other claims they

17  hold in the case.  So I am going to overrule that objection

18  as well.

19          So with those findings, I find that the Third

20  Amended Plan of Reorganization, as proposed, contingent

21  upon it actually being filed directly on the docket as the

22  Third Amended Plan, may be confirmed.  And so what I need

23  is MUFG to file the Third Amended Plan and upload a

24  proposed form of order confirming it.  Okay?

25          ME. LAUTER: Will do.

```
1          THE COURT: All right.  Do Mr. Healy or Mr.

2   Stubbe, do you wish to sign off on that -- approve it as to

3   form or not?

4          MR. HEALY: It depends on what the Court is

5   anticipating Mr. Lauter to present, a one-liner, or some

6   findings.  If it's a one-liner, I don't need to sign off on

7   it.  If you're going to include some things or you want Mr.

8   Lauter to include some things, then --

9          MR. LAUTER: I'm just going to incorporate the

10  findings as stated on the record.

11         MR. HEALY: That's fine.  I don't need to --

12         MR. LAUTER: It would be like a short, you know --

13         THE COURT: Ultimately, the record is the full

14  findings, so you can certainly make some reference to them,

15  but you don't actually have to repeat everything I've said.

16         MR. LAUTER: That's what I mean as stated on the

17  record, yes, something like that.

18         MR. HEALY: Then I don't need to sign off on it.

19         MR. LAUTER: Okay.

20         MR. STUBBE: Agreed, Your Honor.

21         THE COURT: All right.  Okay.  All right, with

22  that, I don't think there's anything further I need to set

23  in the main case at this time.  I anticipate at some point

24  I'll be seeing more in the adversary proceeding.

25         MR. HEALY: Thank you, Your Honor.
```

1      MR. STUBBE: Thank you, Your Honor.

2      MR. LAUTER: Next week, I think.

3      THE COURT: Oh, okay, so apparently we have a

4 status conference in the adversary proceeding on Monday.  I

5 don't have all the parties to the adversary proceeding

6 here, so I won't do anything with that today.

7      MR. LAUTER: Okay.

8      THE COURT:  All right.  Thank you.

9      ALL COUNSEL: Thank you, Your Honor.

10      THE COURT: Thank you,.

11      COURTROOM DEPUTY: That concludes the hearing.

12      (Whereupon, the proceedings are concluded at 12:03

13 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6

7          I certify that the foregoing is a correct

8    transcript from the digital sound recording of the

9    proceedings in the above-entitled matter.

10

11   DATED: December 22, 2017

12

13                        By:___/s/ Jo McCall_____

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

```
 1                 UNITED STATES BANKRUPTCY COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                     (SAN JOSE DIVISION

 4   In re:

 5   ROBERT S. BROWER. SR.,          Case No. 15-50801

 6                                   Chapter 11

 7                                   San Jose, California
                                     November 12, 2015
 8                                   10:42 a.m.

 9            Debtor.
     _____/

10

11               TRANSCRIPT OF PROCEEDINGS
              DEBTOR'S MOTION TO SELL PROPERTY
            0PPOSITION FILED BY MUFG UNION BANK

12

13       BEFORE THE HONORABLE M. ELAINE HAMMOND
             UNITED STATES BANKRUPTCY JUDGE

14

     APPEARANCES:
15

     For the Debtor:       CAMPEAU, GOODSELL and SMITH
16                         BY: WILLIAM J. HEALY, ESQ.
                           440 North 1st Street #100
17                         San Jose, California 95112

18

     For the U.S. Trustee: OFFICE OF THE U.S. TRUSTEE
19                         BY: SHINING HSU, ESQ,
                           280 South First Street #268
20                         San Jose, California 95113

21

     For MUFG Union Bank:  SHEPPARD MULLIN RICHTER & HAMPTON
22                         BY: STEVEN B. SACKS, ESQ.
                           Four Embarcadero Center 17th Floor
23                         San Francisco, California 94111

24

     Also Present:         ROBERT BROWER, SR.
25
```

APPEARANCES (CONTINUED):

Court Recorder:            KATIE ROSE
                           UNITED STATES BANKRUPTCY COURT
                           280 South First Street
                           San Jose, California 95113


Transcription Service:     Jo McCall
                           Electronic Court
                           Recording/Transcribing
                           2868 E. Clifton Court
                           Gilbert, Arizona 85295
                           Telephone: (480) 361-3790

1      P R O C E E D I N G S

2   November 12, 2015                    10:42 a.m.

3                      -oOo-

4           COURTROOM DEPUTY: Line No. 6, Robert Brower.

5           MR. HEALY: Good morning, Your Honor, William

6   Healy for the Debtor and moving party.  With me, is the

7   Debtor.

8           THE COURT: Okay.  Good morning.

9           MS. HSU: Good morning, Your Honor, Shining Hsu

10  for the U.S. Trustee.

11          MR. SACKS: Good morning, Your Honor, Steven Sacks

12  for MUFG Union Bank, N.A.

13          THE COURT: Okay, good morning.  So this is a

14  motion for sale of property.  It's basically stock in

15  Coastal Cypress Corporation, the Debtor's interest in the

16  corporation.

17          MR. HEALY: That's correct, Your Honor.

18          THE COURT: All right.  I have reviewed --

19          MR. HEALY: Also the status conference as well.

20          THE COURT: Okay.  Got to follow with what

21  happens.

22       (Laughter.)

23          THE COURT: I reviewed the motion and the

24  opposition and the reply.  I'll tell you where I am to

25  start.  I don't think the sale can be approved on the

1  evidence presented.  The only support for the sale is Mr.

2  Brower's declaration.  It's the primary asset of the

3  bankruptcy case.  The asset being sold is an interest in a

4  closely held corporation.  This is very different from when

5  you're selling a piece of real property that has been

6  listed on the MLS and has been actively marketed by a

7  broker, and you've had either multiple offers or at least

8  you've had it on the market for a while and know that this

9  is the real value or a publicly noticed auction of

10  vehicles, anything like that.

11         This is a shareholder who's negotiating with the

12  company he helped found, and so there's some showing that's

13  required of why it is indeed fair value, and what's here,

14  thus far the evidence presented is Mr. Brower and counsel

15  stating its fair value.  That's not the same.  So I think

16  we may even need an evidentiary hearing or something

17  further to take this to be approved.

18         MR. HEALY: Well, Your Honor, we didn't honestly

19  think there would be any opposition to the motion because

20  since July, the opposing party, the creditor, Union Bank,

21  has had the statement from the accountant for Coastal

22  determining the per share value at 2.54, and the sale is at

23  2.54.  That's -- I mean we didn't think it was necessary to

24  add that, but they put that into the record and we're

25  selling it for 2.54.  There's no discount; it's a hundred

1  cents on the dollar.  So there's no negotiation really that

2  went on.  It's worth 2.54 --

3        THE COURT: But as I recall, it just states; it

4  doesn't say how it was calculated, correct?

5        MR. HEALY: Well, she has an e-mail that says

6           "cash upon sale of property, net cash to

7           shareholders, dollars per share,"

8        THE COURT: Okay.

9        MR. HEALY: And the Union Bank also attached part

10  of Mr. Brower's examination, which is done in July, where

11  he said that figure is figured out by subtracting cost of

12  sale and other expenses.  So to the extent there's any

13  opposition, the opposition has known exactly this price

14  since July because we gave this to them in July.  They

15  examined him July 31st.  So I think the record has got

16  enough evidence in there to determine the price as 2.54 per

17  share.

18        THE COURT: Okay.  Mr. Sacks?

19        MR. SACKS: Your Honor, the problem is that we

20  don't have the accountant's declaration.  We don't know

21  what information supports what she actually calls a

22  preliminary calculation.  So there's no way to tell how

23  much money is in Coastal and therefore how she gets from 12

24  million dollars that was received from the buyer of the

25  property -- we know there were about four and a half

1   million dollars of secured claims against that property.

2   That left a substantial amount of about seven and a half

3   million.  We don't know how she got from seven and a half

4   million down to 2.4 million.

5           And we also don't know whether this is the value

6   per share that is going to other shareholders, whether

7   they're going to get more or less.  Mr. Brower hasn't come

8   forward with any of that information.

9           THE COURT: How is that relevant?

10          MR. SACKS: Well, it's relevant because if other

11  shareholders were selling for four dollars a share, that

12  would suggest Mr. Brower's shares were worth four dollars a

13  share.

14          THE COURT: And what if no one else is selling?

15          MR. SACKS: Well, then at least we would need the

16  dollars that are in the company to know whether this is a

17  fair offer.  There's nothing to support, as the Court said,

18  what the market value is of these shares or other than this

19  preliminary accountant's e-mail that we had to put in the

20  record.  There wasn't anything in the motion that supported

21  the value at all, other than Mr. Brower saying that the

22  accountant had said this, which is inadmissible.  And the

23  accountant -- even once it's in the record, the

24  accountant's e-mail doesn't support this value.

25          I should add that we would like to see these

1    shares disposed of.  We're between a rock and a hard place

2    here, because obviously the shares don't do creditors much

3    good.  What helps the creditors is to get the cash into the

4    estate, but there's a history here of assets not belonging

5    to Mr. Brower that everybody thought did belong to Mr.

6    Brower.  This is the only asset that he admits is his of

7    any significance, and so it's important that this one be

8    properly valued before it just disappears.

9              THE COURT: Does the Trustee have a position?

10             MS. HSU: Not at this time, Your Honor.

11             THE COURT: Okay.

12             MR. HEALY: Your Honor, this is exactly why the

13   bank took Mr. Brower's -- one, they asked for documents.

14   They got this document.  We had previously given them

15   another document that was less significant than this, and

16   that's why they examined him in July.  So the bank has been

17   sitting around since July and now here we are in November,

18   saying, we need more; we need more; we need more.  I've

19   dealt with banks for 20 years.  There is no such -- we've

20   had enough answer coming from the bank.  This --

21             THE COURT: That's why you have trials.

22             MR. HEALY: Well, a box always arrives a month

23   after the trial too, in my experience.  But, you know, this

24   is why --

25             THE COURT: I'm sorry, the box of what?

1      MR. HEALY: Usually in my experience, there's more

2 documents that show up after trial.  Banks never give it to

3 you all.  They're never satisfied that you give them

4 enough.  This is exactly what this partner at Hayashi &

5 Wayland -- they've been around for a while -- she went

6 through the entire calculation.  It's right there all in

7 front of us, and the risk that the Debtor has is, if he

8 doesn't get approval of the sale, there's no assurance --

9 I'm not trying intimidate anybody or scare them; it's the

10 practicality.

11      The other shareholders may not, or the

12 corporation essentially through the other shareholders, may

13 not be so willing to allow Mr. Brower to leave with his

14 money while they're not.

15      THE COURT: Okay.  What you said is, you know,

16 that it may be lost.  Now for the first time, you've told

17 me why, but it doesn't say why they may not be -- it's a

18 closely held corporation.  There are a small number of

19 shareholders.  There are always certain risks.  The

20 evidence you're relying on is a document I cannot read.

21      "Bob:  Below is the preliminary calculation I

22           have done for the sales price, net cash to

23           shareholders and dollar per share.  Coastal

24           Cypress Corporation sale and ..."

25 And I can't make out the remaining words, "cash flow..."

1　　　　　MR. HEALY: It says "winding down."

2　　　　　THE COURT: Cash upon blank property, numbers that

3　are maybe a one, two -- don't know the rest, net cash to

4　shareholder two-four - something; I can't make out, dollars

5　of share --　I don't have the accountant here.　I think --

6　well, I don't think; I am not prepared to approve the sale

7　in light of the opposition, because I do not have enough

8　information to determine whether a fair value is being

9　received and to the best interest of creditors.

10　　　　　There are two options.　I can set it for an

11　evidentiary hearing shortly.　It sounds like there should

12　need to be some need to exchange exhibits of what you've

13　prepared to present at trial.　It sounds like most of the

14　discovery has already been done, so I could set an

15　evidentiary hearing shortly or I can dismiss it with

16　prejudice -- I'm sorry -- deny it without prejudice to it

17　being brought with supplemental evidence.

18　　　　　MR. HEALY: I just want to consult with my client.

19　　　　　THE COURT: Certainly.

20　　　　　MR. HEALY: I apologize for the bad copy, but

21　you're not the only one with a bad copy, although I can

22　read mine.　If that's the Court's position, we'll go with

23　Option 2, just dismiss without prejudice and the -- it's

24　just easier that way.　It's more effective, cost effective,

25　to do it that way.

1       THE COURT: Okay.  On that basis, I'll deny the

2  motion without prejudice to it being brought with further

3  evidence and support.

4       MR. HEALY: Do you need a formal order, or just

5  the record and whatever documents --

6       THE COURT: The Court will prepare an order.  For

7  the reasons stated on the record, the motion is denied

8  without prejudice.

9       MR. HEALY: Understood.  Thank you, Your Honor.

10      THE COURT: All right.  So now we do get to the

11 status conference.  So, what's next?

12      MR. HEALY: Well, it'll take us a couple weeks, I

13 think, to regroup on this one and see what we can get, but

14 this is a primary issue, a stepping stone going forward.

15 What I had recommended in my status conference was to come

16 back in January because I thought by that time, we would

17 have a) a sale approved; and b) the proceeds of that sale.

18 So I may have to kind of push that out a little further.

19      THE COURT: Okay.

20      MS. HSU: Your Honor, the Debtor is behind on

21 operating reports.  The September operating report was due

22 on October 20th, and that hasn't been filed.

23      MR. HEALY: I believe it's been filed.

24      MS. HSU: I'll check again.

25      MR. BROWER: They even got checks.

1          MR. HEALY: Yeah, we've been pretty religious in

2     filing those early in the month, and we're ready to file

3     this month's –– we're ready to file the October one which

4     is due in a week or so next week.

5          THE COURT: The last operating report was filed

6     October 9th for September.  Is that the one you're talking

7     about?

8          MR. HEALY: And October's is in my e-mail ready to

9     be reviewed.

10          MS. HSU: All right.  I apologize, Your Honor.

11     I'll double check the docket.

12          MR. HEALY: Very good.

13          MS. HSU: My records were that September had not

14     been filed.  Okay.  So the operating reports, if September

15     has been filed, then they are current.  The quarterly fees

16     are current.  We are looking for a Plan at this point.  I

17     know that the status conference statement indicated that

18     more time, 90 days or so, was necessary to deal with the

19     sale motion and tax consequences.  But now that that's been

20     dealt with, I would like to hear from Debtor's counsel what

21     needs to be contemplated before a Plan can be put on the

22     record.

23          MR. HEALY: I think what needs to be contemplated

24     is exactly what I said in the status conference, the sale

25     of these shares, evaluate the tax consequences, and then

1   move forward, and we intend on putting the motion right

2   back on calendar as soon as we can get the evidence that

3   the Court is looking for.  So essentially, we've just been

4   delayed by the denial without prejudice of this motion.

5           MS. HSU: Is there a reason why the sale of the

6   shares can't happen through the Plan?

7   \           THE COURT: They can.  It may be slower.

8           MR. HEALY: Yes.

9           THE COURT: but I would suggest, though, that you

10  need to know the tax consequences at the same time you're

11  proposing your sale, because it affects the estate.

12          MR. HEALY: Well, we have no choice but to sell

13  these shares, so I think --

14          THE COURT: Okay.  My understanding is that there

15  was -- these funds were always to come in to the Debtor,

16  either through a distribution from the corporation or sale

17  of shares, correct?

18          MR. HEALY: That was our intent, yes.

19          THE COURT: Right.  Okay.  So there are tax

20  consequences either way.

21          MR. HEALY: I would agree with you.

22          THE COURT: Anything --

23          MR. SACKS: We don't have a problem with 60 to 90

24  days to continue this out and see where we are.  The

25  situation is going to be difficult -- in this situation,

1 it's going to be difficult for the Debtor to confirm a Plan

2 without agreement from the bank, because we are the primary

3 creditor in the case, and at this point, we haven't really

4 had Plan discussions with the Debtor, but I think given

5 that, it makes sense, rather than cut this short at this

6 time, we agree to have it continued til January or

7 thereabouts to see where we are then.

8        THE COURT: Okay. All right. So what I'm

9 inclined to do here is set a continued status conference

10 for January 14th at 10:30. If there are other motions in

11 the meantime, we may move the status conference around so

12 that it's heard with them.

13        I would just add one additional observation.

14 From what I know, which admittedly is not everything; I

15 have not been privy to any of the discovery. It doesn't

16 look like this is a particularly difficult small

17 corporation to value. As I understand it, all its assets

18 are sold. It's holding cash. You know, how is cash from

19 the sale distributed. It's not like you're trying to value

20 good will of an ongoing operation. So a lot of the fuzzy

21 stuff that goes into evaluation isn't really at play here.

22        MR. HEALY: I would agree.

23        THE COURT: Okay. All right.

24 \        MR. HEALY: Thank you, Your Honor.

25        THE COURT: All right. Thank you.

1          MS. HSU: Thank you, Your Honor.

2          THE COURT: All right.  And that concludes our

3   calendar.

4   (Whereupon, the proceedings are concluded at 10:57 a.m.)

5

6

7

8

9                   CERTIFICATE OF TRANSCRIBER

10

11

12          I certify that the foregoing is a correct

13   transcript from the digital sound recording of the

14   proceedings in the above-entitled matter.

15

16   DATED: December 20, 2017

17

18                              By:___/s/ Jo McCall_____

19

20

21

22

23

24

25