1   STEVEN T. GUBNER – Bar No. 156593
    JASON B. KOMORSKY – Bar No. 155677
2   JESSICA L. BAGDANOV – Bar No. 281020
    JESSICA S. WELLINGTON – Bar No. 324477
3   BG LAW LLP
    21650 Oxnard Street, Suite 500
4   Woodland Hills, CA 91367
    Telephone:  (818) 827-9000
5   Facsimile:  (818) 827-9099
    Email:      sgubner@bg.law
6               jkomorsky@bg.law
                jbagdanov@bg.law
7               jwellington@bg.law

8   Attorneys for Michael G. Kasolas, Liquidating Trustee
    For the Robert Brower, Sr. Liquidating Trust

9
                    UNITED STATES BANKRUPTCY COURT

10
                    NORTHERN DISTRICT OF CALIFORNIA

11
                          SAN JOSE DIVISION

12
    In re                              | Bk. Case No. 15-50801 MEH
13
    ROBERT BROWER, SR.,                 | Chapter 11
14
                          Debtor.        | Adv. Case No. 21-05029 MEH
15

16
    MICHAEL G. KASOLAS, solely in his capacity    | **PLAINTIFF'S OMNIBUS OPPOSITION TO**
17  as the Liquidating Trustee for the Robert Brower, | **DEFENDANTS' MOTIONS TO DISMISS**
    Sr. Liquidating Trust,                        | **PLAINTIFF'S SECOND AMENDED**
18                                                | **COMPLAINT PURSUANT TO RULE**
                          Plaintiff,             | **12(b)(6) [DOCS. 110, 113 & 124]**
19
20  v.                                           | Date:   June 6, 2022
                                                 | Time:   11:00 a.m.
21                                               | Place:  Courtroom 11
    PATRICIA BROWER, solely as trustee of the    |         United States Bankruptcy Court
22  BROWER TRUST (2015), dated June 30, 2015;     |         280 South First Street
    et al.,                                      |         San Jose, California 95113
23                        Defendants.
24
25
26
27
28

2792013

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................1

II. THE SECOND AMENDED COMPLAINT ALLEGATIONS...........................................4

III. THE BABCOCK/NOBLES DEFENDANTS CANNOT RAISE ARGUMENT ON THE SUSPENDED CORPORATIONS' BEHALF ..............................................9

IV. NONE OF THE CHALLENGES TO THE SAC HAVE MERIT .....................................11

    A. Relevant Legal Standard ..........................................................11

    B. The Sale of Coastal's Asset Required Shareholder Consent and Court Approval .......................................................................12

    C. Once Liquidated, the Proceeds of Coastal's Liquidation Event Belonged to Coastal's Shareholder .............................................13

    D. The Protections of Section 1001 and Section 363 Applied to the Sale of the Wine Estate Property and, thus, the Resulting Cash Proceeds from the Sale.......18

    E. The Second Claim for Relief Adequately States a Claim for Recission...............21

    F. The Fact that Oldfield Creely Was Paid with Proceeds that Belonged to the Debtor's Estate without Obtaining Court Approval While Performing Work for a Third Party Only Serves to Demonstrate that the Debtor Received No Benefit.............................................................21

    G. As Counsel for the Debtor-in-Possession, JRG Needed Court Approval or Faced Disgorgement .............................................22

    H. JRG's Representation of Conflicting Interests is Not Subject to the Litigation Privilege and Can Form the Basis for a Malpractice Claim ..................................22

    I. The Court Rejected the Statute of Limitations Argument; JRG's Attempt to Claim that the Trustee Has Not Acted Promptly Is Belied by the Plan.................24

V. CONCLUSION.................................................................25

i

2792013

# TABLE OF AUTHORITIES

Page

**Cases**

*Alta Berkeley VI C.V. v. Omneon, Inc.*,
41 A.3d 381 (Del. 2012) .................................................................................. 16

*Amesco Exports, Inc. Associated Aircraft Manufacturing & Sales, Inc.*,
977 F. Supp. 1014 (C.D. Cal. 1997) ............................................................... 10

*Bank of New York Mellon v. 251 Gotham LLC*,
604 B.R. 71 (Bankr. S.D. Ala. 2019) ............................................................. 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................... 11

*Beltran v. Capitol Records, LLC*,
2013 WL 968248 (N.D. Cal. Mar. 12, 2013) ............................................. 3, 10

*Bickston v. Federal Firearms Corp. of Cal.*,
277 Cal. App. 2d 574 (1964) .......................................................................... 12

*Bozzio v. EMI Group Ltd.*,
811 F.3d 1144 (9th Cir. 2016) ........................................................................ 10

*Cahill v. Liberty Mut. Ins. Co.*,
80 F.3d 336 (9th Cir. 1996) ............................................................................ 11

*Equity Funding Corp. of America v. Financial Associate*,
492 F.2d 793 (9th Cir. 1974) .......................................................................... 13

*Estakhrian v. Obenstine*,
233 F. Supp. 3d 824 (C.D. Cal. 2017) ............................................................ 23

*Fayer v. Vaughn*,
649 F.3d 1061 (9th Cir. 2011) ........................................................................ 11

*In re Coastal Alaska Lines, Inc.*,
920 F.2d 1428 (9th Cir. 1990) ........................................................................ 25

*In re Count Liberty, LLC*,
370 B.R. 259 (Bankr. C.D. Cal. 2007) ............................................................ 23

*In re DeRosa-Grund*,
544 B.R. 339 (Bankr. S.D. Tex. 2016) ............................................................ 20

*In re Enron Corp.*,
316 B.R. 434 (Bankr. S.D.N.Y. 2004) ............................................................ 11

*In re First Prot., Inc.*,
440 B.R. 821 (B.A.P. 9th Cir. 2010) ............................................................... 14

Case: 21-05029   Doc# 139   Filed: 05/23/22   Entered: 05/23/22 14:43:04   Page 3 of
32

2

3    **Cases**

4    *In re Fitness Holdings,*
        714 F.3d 1141 (9th Cir. 2013) ........................................................................................ 11
5
     *In re JLM, Inc.,*
6        210 B.R. 19 (B.A.P. 2d Cir. 1997)................................................................................. 23

7    *In re Liquimatic Systems, Inc.,*
        194 F. Supp. 625 (S.D. Cal. 1961) ............................................................................... 18
8
     *In re Manchester Gas Storage, Inc.,*
9        309 B.R. 354 (Bankr. N.D. Okla. 2004) ...................................................................... 20

10   *In re Martinez,*
        610 B.R. 290 (Bankr. N.D. Cal. 2019) .......................................................................... 2
11
     *In re Milden,*
12       111 F.3d 138 (9th Cir. 1997) ................................................................................... 2, 13

13   *In re Pilgrim's Pride Corp.,*
        442 B.R. 522 (Bankr. N.D. Tex. 2010)........................................................................... 2
14
     *In re Pisculli,*
15       2009 WL 700059 (Bankr. E.D.N.Y. Mar. 4, 2009) ..................................................... 15

16   *In re Redf Mktg., LLC,*
        536 B.R. 646 (Bankr. W.D.N.C. 2015) ........................................................................ 25
17
     *In re Reed,*
18       532 B.R. 82 (Bankr. C.D. Ill. 2015)............................................................................. 11

19   *In re S. Indus. Banking Corp.,*
        66 B.R. 349 (Bankr. E.D. Tenn. 1986) ........................................................................ 25
20
     *In re Whitney Place Partners,*
21       147 B.R. 619 (Bankr. N.D. Ga. 1992) ......................................................................... 23

22   *In re Williams,*
        104 B.R. 296 (Bankr. C.D. Cal. 1989)..................................................................... 20, 21
23
     *In re Zeman,* No. 09-52559-C,
24       2010 WL 3123144 (Bankr. W.D. Tex. Aug. 6, 2010) ................................................. 20

25   *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.,*
        136 Cal. App. 4th 212 (2006) ...................................................................................... 10
26
     *Miller v. McColgan,*
27       17 Cal. 2d 432 (1941) .................................................................................................. 14

28

**TABLE OF AUTHORITIES (cont'd)**

Page

**Cases**

*Nelson v. Anderson*,
72 Cal. App. 4th 111 (1999) .................................................................................. 15

*Timberline, Inc. v. Jaisinghani*,
54 Cal. App. 4th 1361 (1997) ................................................................................ 11

*United States v. 2.61 Acres of Land, More or Less, Situated in Mariposa Cty., State of Cal.*,
791 F.2d 666 (9th Cir. 1985) ................................................................................. 11

*United States v. Goodstein*,
883 F.2d 1362 (7th Cir. 1989) .............................................................................. 20

**Statutes**

11 U.S.C.,
Section 363(b) ............................................................................................... *passim*

11 U.S.C.,
Section 549 ................................................................................................ 2, 3, 20, 21

California Corporations Code,
Section 1001 ................................................................................................. *passim*

California Revenue and Tax Code,
Section 23304.1 .................................................................................................. 4

**Rules**

Federal Rules Bankruptcy Procedure,
Rule 2016(a) ........................................................................................................ 22

Federal Rules of Civil Procedure,
Rule 12(b)(6) ................................................................................................ 1, 11, 21

2792013

Case: 21-05029   Doc# 139   Filed: 05/23/22   Entered: 05/23/22 14:43:04   Page 5 of 32

1    Michael G. Kasolas, Liquidating Trustee for the Robert Brower, Sr. Liquidating Trust, and

2    Plaintiff herein ("Liquidating Trustee" or "Plaintiff"), hereby opposes (the "Opposition") *Defendant*

3    *Oldfield Creely, LLP's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Rule*

4    *12(b)(6)* (the "Oldfield Creely MTD") [Doc. 110] filed by Oldfield Creely, LLP ("Oldfield Creely"),

5    the *Aurora Capital Advisors, Richard Babcock, and Anthony Nobles Motion to Dismiss Second*

6    *Amended Complaint Pursuant to Rule 12(b)(6)* (the "Babcock/Nobles MTD") [Doc. 113] filed by

7    Aurora Capital Advisors ("Aurora Capital"), Richard Babcock ("Babcock"), and Anthony Nobles

8    ("Nobles" and, collectively, the "Babcock/Nobles Defendants"), and the *Motion to Dismiss Second*

9    *Amended Complaint Pursuant to Rule 12(b)* (the "JRG MTD") filed by JRG Attorneys at Law, LLP

10   ("JRG") (the Babcock/Nobles MTD, together with the Oldfield Creely MTD and JRG MTD, the

11   "Motions" and the Babcock/Nobles Defendants, together with Oldfield Creely and JRG,

12   "Defendants").

13   **I.    INTRODUCTION**

14         California law is clear:  When a corporation sells all or substantially all of its assets, unless

15   done in the ordinary course of business, it may only do so with shareholder consent.  Here, Coastal

16   Cypress Corporation ("Coastal"), which was 100% owned by the Debtor Robert Brower Sr.

17   ("Debtor"), sold its only operating asset, a wine estate property located at 8890 and 8940 Carmel

18   Valley Road in Carmel, California (the "Wine Estate Property").  The sale of the Wine Estate

19   Property was not in the ordinary course of the Debtor's business; rather, it was a defined

20   "Liquidation Event" under the governing amended articles of incorporation (the "Amended

21   Articles") and a sale of assets under Section 1001 of the California Corporations Code ("Section

22   1001"), as well as 11 U.S.C. §363(b) (insofar as the sale was not consummated until after the Debtor

23   filed for bankruptcy protection).  It was also not in the ordinary course because Coastal was not in

24   the business of buying and selling properties.  Coastal was in the business of holding the Wine Estate

25   Property, and the sale of the Wine Estate Property rendered Coastal a non-operating entity with cash

26   proceeds (the "Proceeds") and nothing else, as this Court previously recognized.  Dkt. No. 27, Exh.

27   A, Transcript of Proceedings dated November 2, 2017, p. 33:5-14.

28

                                                    1

Because the sale was not in the ordinary course of Coastal's business, the sale required shareholder consent and, because the sale had not been consummated prior to the bankruptcy filing, Court approval because indisputably the shares were assets of the Debtor's bankruptcy estate. *See In re Milden*, 111 F.3d 138, *3 (9th Cir. 1997) (unpublished) ("stock ownership interest in a corporation wholly owned by the debtors becomes property of the estate upon commencement of the case"). Thus, only the Debtor's bankruptcy estate, not the Debtor personally, could provide shareholder consent to the sale of the Wine Estate Property. Indeed, law of the case establishes that any use or disposition of Coastal's shares after the bankruptcy was filed required this Court's authorization. *See* Second Amended Complaint ("SAC"), Exh. 6, *MUFG Union Bank N.A. v. Robert Brower, Sr., et al.*, Adv. No. 17-5044 [Dkt No. 123] Memorandum Decision on Motions for Summary Judgment, at pages 120-121 (finding conversion of shares of Coastal to Delaware corporation without court approval was an avoidable transfer under Section 549).[1]

Further to this point, once there was a Liquidation Event as a result of the sale of Coastal's only operating asset, the Proceeds were required to be distributed to the Debtor's bankruptcy estate, the lone shareholder, pursuant to the Amended Articles. Thus, both the Proceeds of the sale of the Wine Estate Property *and* control over the Proceeds belonged to the Debtor's bankruptcy estate. Pursuant to the Amended Articles, the sole shareholder no longer possessed an indirect right to dividends or distributions, as it might with respect to an operating entity's income; rather, California law and the Amended Articles created an immediate direct right in the Proceeds. Moreover, with no operations, only the shareholder could dictate any contrary use of the Proceeds, which use would require Court approval. Once liquidated, the officers and directors were divested of any right to reinvest the Proceeds absent shareholder approval. SAC, Exh. 1, ART. III.B.2, ART. III.C.2.

Clearly, the sale of the Wine Estate Property constituted the sale of all of Coastal's operating assets. The cash received is merely the liquidated Proceeds thereof. Defendants argue they did not receive substantially all of the Proceeds. But, it matters little whether the Debtor gave the resulting

---

[1] *See In re Martinez*, 610 B.R. 290, 296 (Bankr. N.D. Cal. 2019) ("law of the case doctrine 'applies in adversary proceedings in a bankruptcy case, and even between separate adversary proceedings in the same bankruptcy case'") quoting *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 530 (Bankr. N.D. Tex. 2010).

2

2792013

$7 million in Proceeds to one person in one distribution or gave incremental amounts to multiple people in multiple transactions.[2]  The Liquidation Event already had occurred, and this divested the Debtor, in his capacity as an officer or director of Coastal, from control over the Proceeds, which Proceeds now belonged to the shareholders under the Amended Articles and California law.   And, because ownership and control of the Proceeds belonged to the shareholder, Court authorization to use such proceeds (because any use was outside the ordinary course as a result of the Liquidation Event) was required pursuant to 11 U.S.C. § 363(b).

The Debtor acknowledged this fact to the Court in periodic status reports.  SAC, Exhs. 2-5. Yet, while the Debtor admitted to this Court that the use of the Proceeds from the sale of the Wine Estate Property required shareholder consent (and, therefore, Court approval), unbeknownst to the Debtor's creditors and this Court the Debtor was transferring the Proceeds to the Defendants.  Thus, all of the transfers of the Proceeds from the liquidation of Coastal as a result of the sale of its Wine Estate Property were made without shareholder consent, which consent could only be given by Court approval that was not obtained, and in violation of 11 U.S.C. § 549.

Defendants Med-Venture Investments, LLC ("Med-Venture") and Aurora Capital Advisors, LLC ("Aurora Capital LLC")[3] are suspended corporations, cannot answer the SAC, and have not sought a continuance in order to revive their corporate status.  The Babcock/Nobles Defendants cannot seek to press the defenses that might otherwise be made by the two suspended corporations. *See Beltran v. Capitol Records, LLC*, 2013 WL 968248, at *3 (N.D. Cal. Mar. 12, 2013) ("person standing in close relationship to the suspended corporation, as she does, cannot sue to enforce the agreement because doing so would be contrary to Section 23301 [of the California Tax Code]"). The Babcock/Nobles Defendants have no standing to raise arguments not belonging to them.

---

[2] Interpretation of the statute to focus on the Proceeds from the Liquidation Event, as the only target of Section 1001, and not the sale of the Wine Estate Property itself in the first instance is nonsensical. The statute requires shareholder approval to "sell, lease, convey, exchange, transfer, or otherwise dispose of all or substantially all of its assets."  Cal. Corp. Code § 1001; *see also Jeppi v Brockman Holding Co.*, 34 Cal. 2d 11, 15-16 (1949) ("The reason for this limitation is that a corporation is organized for the purpose of doing business of some nature, and, if so, its shareholders have the right to insist that the corporation continue for the purpose for which it was organized.").

[3] Med-Venture and Aurora Capital LLC are the real parties in interest, as they had the purported marketing agreements and received over time $1.7 million of the proceeds of the Wine Estate Property sale.  SAC, Exhs. 19, 22.  Neither are parties to this motion, as they are suspended.

3

Even if Med-Venture and Aurora Capital LLC were properly before this Court, their entitlement to approximately $1.7 million in the sale of Coastal (and, in turn, the Babcock/Nobles Defendants' receipt of these monies as equity owners) was the product of fraud as alleged in the SAC (not unlike Messrs. Babcock and Noble's prior claim of ownership of Coastal). As alleged, neither Med-Venture nor Aurora Capital LLC were consultants, they provided no marketing services and, in fact, provided no services at all. Both entities were controlled and owned by Babcock and Nobles, both marketing agreements were in material respects identical, both purported to provide duplicative services, and both were suspended corporations at the time of the sale, at the time that some of the alleged services were to be provided, at the time they received payments (for the services not rendered) and currently. Indeed, Aurora Capital LLC was retained after Coastal was already in negotiations with the buyer. As suspended corporations, they were not entitled to payment under the marketing agreements even assuming, for sake of argument, they had actually performed any services. See Cal. Rev. & Tax. Code § 23304.1. Even if Med-Venture and Aurora Capital LLC were revived, it would still be a question of fact as to whether they were legitimate creditors of Coastal entitled to any of the Proceeds or whether their claims for compensation for work not performed, like the prior claims of ownership in Coastal, were sham.

Finally, the remaining sundry arguments, such as who Oldfield Creely and JRG represented, whether rescission is available, the claim of litigation privilege and statute of limitations are meritless. For the foregoing reasons, the motions to dismiss should be denied.

## II.     THE SECOND AMENDED COMPLAINT ALLEGATIONS

Coastal was formed by Debtor in the early 1980's solely for the purpose of holding title to the Wine Estate Property. SAC, ¶ 1. On March 11, 2015, the Debtor commenced this bankruptcy case. ¶ 2. At that time, the Wine Estate Property had not yet been sold. ¶ 4. As a result of the commencement of the Debtor's bankruptcy, 100% of the shares of Coastal, which were owned by the Debtor, became assets of the Debtor's bankruptcy estate. ¶ 3. The Debtor did not seek or obtain this Court's approval for the use of Coastal's shares to approve the sale of Coastal's lone asset pursuant to Section 1001 of the California Corporations Code or 11 U.S.C. § 363(b).

4

2792013

The sale of the Wine Estate Property constituted a Liquidation Event under the Amended Articles. ¶¶ 5-6. Pursuant to Section 1001, only the shareholder of Coastal could have consented to the sale of the Wine Estate Property and to the use of the Proceeds thereof. ¶ 7.

After the bankruptcy was filed, the Debtor, in his individual capacity or in his capacity as an officer and/or director of Coastal had no authority to sell the Wine Estate Property and/or to use, transfer, or dissipate the Proceeds from this sale. ¶ 8. Given that the shares of Coastal were owned by the Debtor's bankruptcy estate, the Debtor was required to seek court approval pursuant to 11 U.S.C. § 363(b)(1). *Id.*

Notwithstanding the prohibitions under California law and bankruptcy law regarding the sale of Coastal's lone asset coupled with the Amended Articles that gave the shareholder an unfettered ownership of the proceeds thereof, the Debtor, working with the Defendants, dissipated the entirety of the Proceeds. ¶ 9. Neither the Debtor's creditors nor the Court was aware of this dissipation. To the contrary, although the Debtor acknowledged the need for shareholder approval, he submitted at least four periodic reports pursuant to FRBP 2015.3 implying that no transfers were taking place. In each, the Debtor claimed to be working on a plan for shareholder approval and failed to disclose that he had been transferring the assets of Coastal to various defendants. SAC Exhs. 2-5.

Per a periodic report dated as of October 7, 2015, the Debtor advised this Court that [t]he Board of Directors in co-operation with the shareholders is reviewing all its options as to purchasing new real estate or other investment strategies." *Id.*, Exh. 2, p. 68. The report as of March 7, 2016, advised the Court as follows:

> "The president was directed, with any other interested board member(s), to review options and ***present a plan to the shareholders*** by the 4th quarter of 2016". The nature of the plan would be to invest the untaxed proceeds of last years sale. The president has begun the process of creating such plan through investigation of investment options.

*Id.*, Exh. 3, p. 82 (emphasis added).

The Debtor's periodic reports continued to advise the Court that the Debtor was still in the process of creating a plan to present to the shareholders. *Id.*, Exh. 4, p. 94, Exh. 5, p. 104. Thus, at all relevant times the Debtor recognized that he as an officer or director of Coastal was not free to transfer or use any of the Proceeds from the sale of the Wine Estate Property. *Id.*, Exhs. 2-5. Rather,

5

2792013

he was required to present a plan for approval by the shareholders, which at all relevant times was the Debtor's bankruptcy estate. Any such plan would have needed shareholder consent and, accordingly, Court approval pursuant to 11 U.S.C. § 363(b).

In March 2011, Coastal filed its Amended Articles with the California Secretary of State. In Article III, the Amended Articles differentiated between dividend rights, which were subject to the discretion of the board of directors, and liquidation rights, which vested the proceeds thereof in the shareholders. *Id.*, Exh. 1, ART. III.C.1 & 2, p. 58.

    1. Dividend Provisions.

    (a) The holders of shares of Series A Preferred Stock shall, prior and in preference to any declaration or payment of any cash dividend on the Common Stock of this corporation, shall be entitled to receive, ***when, as and if declared by the Board of Directors,*** out of any assets legally available therefore, . . . .

    (b) After payment of the Series A Dividend, the holders of shares of and Series A Preferred Stock shall be entitled to participate pro rata (on an as-converted basis) in any cash dividends paid on the Common Stock.

    2. Liquidation Preference.

    (a) ln the event of any Liquidation Event (as defined below), the holders of Series A Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets of this corporation to the holders of Common Stock by reason of their ownership thereof: an amount per share equal to the Series A Liquidation Preference (as defined below) for each outstanding share of Series A Preferred Stock (as adjusted for subsequent Recapitalization Events). The "Series A Liquidation Preference" shall be equal to $2.00.

    If upon the occurrence of a Liquidation Event, the assets and funds to be distributed among the holders of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then, the entire assets and funds of the corporation legally available for distribution shall be distributed ratably among the holders of the Series A Preferred Stock in proportion to the amounts that would he payable to such holders if such assets were sufficient to permit payment in full.

    (b) Upon the completion of the distribution required by Section 2(a), the remaining assets of the corporation available for distribution to shareholders shall be distributed among the holders of the Common Stock pro rata based on the number of shares of Common Stock held by each.

*Id.*, Exh. 1, pp. 54-55 (emphasis added). If the Liquidation Event did not generate sufficient monies to make a full preferential distribution, there would be a pro rata distribution "in proportion to the

6

2792013

amounts that would be payable to such holders if such assets were sufficient to permit payment in full." *Id.*, Exh. 1, p. 55. The remaining corpus, if any, "***shall*** be distributed among the holders of the Common Stock. . .". *Id* (emphasis added); see also SAC, Exh. 1, ART. III.C.2.

The Amended Articles at Section (c)(1) also detailed what would constitute a Liquidation Event and trigger a Liquidation Preference, as follows:

> For purposes of this Section 2, a "Liquidation Event" shall be deemed to be occasioned by, or to include, (A) any liquidation, dissolution or winding up of the corporation, whether voluntary or involuntary, (B) the acquisition of the corporation by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation, hut excluding any merger effected exclusively for the purpose of changing the domicile of the corporation), (C) a transaction or series of transactions in which fifty percent (50%) or more of the corporation's voting power Is transferred or (D) ***a sale, lease, exclusive license or other disposition of all or substantially all of the assets, technology or intellectual property of the corporation*** including, without limitation, any such transaction with a direct or indirect subsidiary of the corporation.

*Id.*, p. 55 (emphasis added). As stated, the sale of "all or substantially all of" Coastal's assets was to be treated identically to a liquidation or dissolution, the purchase of the entity by another entity, or a transaction whereby more than 50% of the voting power is transferred. *Id.* By definition, the sale of the Wine Estate Property, as the Debtor's sole asset, was a defined Liquidation Event. *Id.*

With respect to the sale of the Wine Estate Property, Coastal entered into a marketing and sales agreement with Med-Venture in January 2011 for a period of two years. *Id.*, ¶ 131, Exh. 19. Although the agreement was for two years, it provided that Med-Venture would get a fee in the amount of $1,120,000 at the time of receipt of any funds from any sale occurring within five years of the inception of the agreement. ¶ 133. As alleged, the three-year tail was not industry standard, let alone standard for an entity that had no background in marketing this type of property and performed no work thereon. ¶¶ 138-139.

No sale of the Wine Estate Property occurred during the term of the Med-Venture agreement. ¶ 140. There is no indication that Med-Venture had any experience in marketing the Wine Estate Property or, for that matter, that it made any efforts to do so. Shortly after Med-Venture was retained, Global Wine Partners ("GWP") was retained to essentially provide the same services for which Med-Venture was retained. Notably, GWP's compensation was limited to 3% of the sale

7

2792013

price and it only provided a 12-month tail after termination of the agreement. ¶ 138. The GWP agreement was commercially reasonable, while that of Med-Venture was not. *Id.* Evidencing that the Med-Venture agreement provided no benefit to Coastal, GWP prepared marketing materials for the sale of the Wine Estate Property. ¶ 137. Of note, the GWP agreement identified Aurora Capital LLC, not Med-Venture as the entity that had contracted to assist Coastal in the marketing of the Wine Estate Property. ¶ 136. Aurora Capital LLC was not in existence at the time. *Id.*

After the Med-Venture agreement terminated but before Coastal entered into an agreement with Aurora Capital LLC, on May 15, 2014, the Debtor was contacted by a prospective purchaser of the Wine Estate Property. ¶ 141. On information and belief, neither Med-Venture nor Aurora Capital LLC had any involvement in finding the prospective purchaser. ¶ 143. Indeed, after negotiations for the sale of the Wine Estate Property had begun and notwithstanding that the Med-Venture tale on its agreement was still in effect, Coastal entered into an almost identical agreement with Aurora Capital LLC (both owned by the same defendants) for the services it had previously contracted for with Med-Venture. ¶¶ 144, 145, 155, Exh. 22. As alleged in the SAC:

> At a minimum, the Med-Venture Agreement—made at a time when its principals believed they were shareholders of Coastal—was not made on commercially reasonable terms and made no sense in light of the fact that Coastal had already entered into an agreement with an entity that actually had expertise in the area. The Aurora Agreement, duplicative of the Med-Venture Agreement, and signed by the same principal of Aurora and/or Aurora LLC that signed the Med-Venture Agreement necessarily provided no new value insofar as Coastal was still on the hook to Med-Venture notwithstanding that the Med-Venture Agreement had terminated over a year earlier and notwithstanding the fact that Med-Venture provided no services to Coastal. Further to this point, both the Aurora Agreement and Med-Venture Agreement provided that they would both assist "in developing a strategy for the sale of its business, identify potential acquirors, and assist in the implementation of the Company's sale strategy." No such strategy was ever created or implemented. In fact, neither company had any background in this area, and the Aurora Agreement was executed after Coastal already had found the buyer for the Wine Estate Property.

¶ 156.

As further evidence of the sham nature of the agreements, as of January 2, 2014, four months before a buyer for the Wine Estate Property was identified, Med-Venture was a suspended corporation. ¶ 155. At that time, Med-Venture was identified as a "medical and technology

8

2792013

investment corporation." *Id.* Aurora Capital LLC was suspended eight months after it entered into the agreement with Coastal, and was pending suspension as of October 28, 2014. *Id.*

After the Debtor filed for bankruptcy protection Oldfield Creely represented Chateau Julien in the connection with the state court action. ¶ 170. In total, Oldfield Creely received $200,357.59 from the Proceeds of the sale of the Wine Estate Property. ¶ 169, Exh. 25. Given that the Proceeds belonged to the Debtor's bankruptcy estate or at least were subject to shareholder consent for their use, neither the Debtor nor Oldfield Creely obtained bankruptcy court approval to pay Oldfield Creely. Neither the Debtor nor Coastal received any benefit from Oldfield Creely's representation of Chateau Julien notwithstanding Oldfield Creely was being paid with the Proceeds.

JRG was retained post-petition and without Court approval to represent the Debtor-in-possession, Coastal, Patricia Bower and her trust, and Butch Lindley in connection with the action to determine ownership in Coastal (identified in the SAC as the "Enhancement Action"). SAC, ¶ 163. JRG's services were paid for by Coastal with the Proceeds. ¶ 164. JRG was also retained to represent Debtor in action filed by MUFG to enforce its loan against Chateau Julien and the Debtor (identified in the SAC as the "State Court Action"). ¶ 165.

JRG withdrew from representation of the Debtor after the Liquidating Trustee became the sole director of Coastal and refused to pay JRG's bills. ¶ 165. JRG also filed an action in state court against the MUFG purportedly on behalf of Coastal, but which action it is alleged was actually for the benefit of the Debtor. The action and JRG's appeals thereof were dismissed with prejudice. ¶ 166. The Proceeds were used to fund this litigation without shareholder consent or Court approval. Indeed, JRG never filed an application to be employed. ¶ 167.

### III. THE BABCOCK/NOBLES DEFENDANTS CANNOT RAISE ARGUMENT ON THE SUSPENDED CORPORATIONS' BEHALF

As an initial matter, neither Med-Venture nor Aurora Capital LLC can raise any defenses to the claims brought against them, as they are suspended corporations. *See Reed v. Norman*, 48 Cal. 2d 338, 343 (1957); Cal. Rev. & Tax. Code § 23301 (West 2001); *see also* SAC, ¶ 155. Although the normal practice is to "permit a short continuance to enable the suspended corporation to effect reinstatement" [*Cadle Co. v. World Wide Hospitality Furniture, Inc.*, 144 Cal. App. 4th 504, 512

9

2792013

(2006)], counsel for the suspended corporations requested no such extension. A clerk's default has been entered against Aurora Capital LLC, and one is pending against Med-Venture.

The failure to request an extension to remedy the suspension, which would reestablish Med-Venture's and Aurora Capital LLC's ability to defend this action, should be seen for what it is. The Babcock/Nobles Defendants hope to convince this Court on Med-Venture's and Aurora Capital LLC's behalf that the SAC is without merit and, thus, avoid the necessity of bringing Med-Venture and Aurora Capital LLC back in good standing. Seeking good standing is not an easy task given that these entities have been suspended for at least seven years and may owe considerable taxes on the amounts paid by the Debtor to them after they were suspended. At a minimum, these entities would have to prepare income tax returns for the past eight years (and pay California taxes due on revenues they received while suspended), and these returns would only further highlight the fraudulent nature of the purported marketing arrangements and post-petition payments made to these two entities.

The other Babcock/Nobles Defendants simply are not in a position to raise arguments that belong to or on behalf of the suspended corporations, as the purported marketing agreements were between Coastal and the two suspended corporations. SAC, Exhs. 19, 22; *see Amesco Exports, Inc. Associated Aircraft Manufacturing & Sales, Inc.*, 977 F. Supp. 1014, 1015 (C.D. Cal. 1997) *order vacated on other grounds*, 87 F. Supp. 2d 1013 (C.D. Cal. 1997) (allowing individual to sue on written contract as to which he is not a party as a third party beneficiary would create a mechanism for avoiding obligations of corporate form, including bar on litigation by suspended corporation); *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.*, 136 Cal. App. 4th 212, 218 (2006); *Beltrans*, 2013 WL 968248, at *3 (permitting individual behind corporation to sue based upon the contract, "despite the suspended status of the contracting party, would allow Beltran to make an end-run around the requirements of Section 23301.") *Id.*

There is nothing in the agreements [SAC, Exhs. 19, 22] that makes the Babcock/Nobles Defendants intended third-party beneficiary status with independent rights under these contracts that could be enforced. *See Bozzio v. EMI Group Ltd.*, 811 F.3d 1144, 1149-1150, 1152 (9th Cir. 2016) (identifying limited exception for intended third party beneficiaries especially where there is no evidence that third party was not directly "responsible for the suspended status of the corporation").

10

2792013

Although the above authorities looked at an individual's right to sue on behalf of the suspended corporation, the statute provides that a suspended corporation can neither sue nor defend. *See Timberline, Inc. v. Jaisinghani*, 54 Cal. App. 4th 1361 (1997) (suspended corporation is disqualified from exercising any right, power, or privilege, including prosecuting or defending an action) citing Cal. Rev. & Tax. Code §23301. Thus, the above authorities should apply with equal force where an individual seeks to present the defense of a suspended corporation.

The very purpose of this statutory scheme is to ensure that corporations are paying their taxes. *See United States v. 2.61 Acres of Land, More or Less, Situated in Mariposa Cty., State of Cal*., 791 F.2d 666, 668 (9th Cir. 1985). Allowing the owners to raise arguments that belong to the contracting but suspended corporations without requiring those corporations to be in good standing would render toothless the prohibition against suspended corporations participating in litigation and would create the very end around that the case law seeks to prohibit.

## IV. NONE OF THE CHALLENGES TO THE SAC HAVE MERIT

### A. Relevant Legal Standard

A Rule 12(b)(6) motion should only be granted "if the complaint fails to allege enough facts to state a claim to relief that is plausible on its face." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (internal quotation marks omitted) (citing, *inter alia*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). For purposes of evaluating a motion to dismiss, the Court must accept as true all well pleaded factual allegations made in the operative pleading and construe them in the light most favorable to the non-movant. *In re Fitness Holdings*, 714 F.3d 1141, 1144-1145 (9th Cir. 2013).

The party seeking dismissal under Rule 12(b)(6) has the burden of proof. *In re Reed*, 532 B.R. 82, 88 (Bankr. C.D. Ill. 2015) ("A party seeking dismissal under Rule 12(b)(6) 'bears a weighty burden' [which] requires that the movant establish 'the legal insufficiency of the complaint.'"); *In re Enron Corp.*, 316 B.R. 434, 449 (Bankr. S.D.N.Y. 2004) (an "unsupported assertion is insufficient to meet [the] burden under a [Rule] 12(b)(6) motion.").

2792013

**B. The Sale of Coastal's Asset Required Shareholder Consent and Court Approval**

In prior briefing and here, the Defendants attempt to equate Coastal with any other corporate entity. As they posit, in the normal course of operations a corporation is managed by its officers and directors. Within the scope of normal operations, they dictate the use of the corporation's assets and, further, determine whether, or if, to make a distribution to shareholders. But, this normal course of operations does not apply to companies that are liquidated.

When a corporation sells or transfers most or all of its assets, shareholders gain rights that they otherwise would not have with respect to the corporate entity. In part, Section 1001 of the California Corporations Code provides as follows:

> (a) A corporation may sell, lease, convey, exchange, transfer, or otherwise dispose of all or substantially all of its assets when the principal terms are approved by the board, and, unless the transaction is in the usual and regular course of its business, approved by the outstanding shares (Section 152), either before or after approval by the board and before or after the transaction.

Cal. Corp. Code § 1001(a). The purpose of Section 1001 is to protect shareholders and creditors. *See Bickston v. Federal Firearms Corp. of Cal.*, 277 Cal. App. 2d 574, 580 (1964) ("[t]he statute in question was enacted for the protection of shareholders and creditors of the corporation, and they alone have the right to object to the transfer of corporate assets in violation of the code section"). Stated another way, "the officers or directors have no power to dispose of all or substantially all of its assets without fully complying with the said section 3901 [now 1001]"). *Id.*

> 'It is the rule at common law . . . that the directors of an ordinary business corporation have no power to dispose of all of its assets without the consent of all its stockholders. This rule has been modified . . . by statute, so that the corporation may dispose of all its assets and wind up its business when authorized by a majority vote of the outstanding stock. . . . ***The reason for this limitation is that a corporation is organized for the purpose of doing business of some nature, and, if so, its shareholders have the right to insist that the corporation continue for the purpose for which it was organized.*** A sale, therefore, of all its property, or so much thereof as would prevent it from continuing in such business, would constitute a violation of the corporate contract. 7 R.C.L. 574.

*Jeppi*, 34 Cal. 2d at 15-16 (emphasis added).

Here, the Debtor sold Coastal's lone asset, the Wine Estate Property. The sale, however, (i) was not within the usual and regular course of business and, in fact, was a defined "Liquidation Event" under the Amended Articles, and (ii) was not closed prior to the filing of Debtor's

12

bankruptcy, which vested the shares of Coastal in the Debtor's bankruptcy estate. Accordingly, not only was shareholder consent required but so too was Court approval insofar as the shares of Coastal were an asset of the Debtor's bankruptcy estate and the only way to cast votes in favor of the sale required the use of the shares. Thus, the sale of the Wine Estate Property triggered both shareholder rights under Section 1001 and also the requirements of 11 U.S.C. § 363(b). *See Equity Funding Corp. of America v. Financial Associate*, 492 F.2d 793, 794 (9th Cir. 1974) (appeal of district court order authorizing trustee to consent to sale of debtor's wholly-owned subsidiary insofar as wholly-owned subsidiaries stock was deemed to be in possession of trustee); *In re Milden*, 111 F.3d 138, at *4 ("Trustee sought and obtained bankruptcy court approval to use property of the estate, viz., the shares of stock in [corporation wholly owned by the debtor] in order to obtain the execution of the requested release"); *In re Baker*, 68 B.R. 360, 363 (D. Or. 1986) (finding that trustee could not make payment from non-debtor corporation to himself and others without obtaining bankruptcy court approval, even though wholly owned corporation never filed for bankruptcy relief); *MUFG Union Bank N.A. v. Robert Brower, Sr., et al.*, Adv. No. 17-5044 [Dkt No. 123] Memorandum Decision on Motions for Summary Judgment, pp. 120-121 (finding merger of Coastal, a California corporation, into a new Delaware corporation required Court approval).

A trustee (or, as the case may be a debtor-in-possession) has "the power and duty to manage all of the assets of the estate, including the stock, books and records in a wholly-owned corporation." *In re Milden*, 111 F.3d 138, at *3. The Liquidating Trustee submits that the sale of the Wine Estate Property required use of the stock pursuant to Section 1001 and Section 363, and no such shareholder consent was obtained, which consent would have required Court approval insofar as the sale had not been consummated at the time that the Debtor filed for bankruptcy. The Debtor was required to provide notice and a hearing, as neither the sale of the Wine Estate Property nor the transfer of the Proceeds thereof were in the normal course of operations. *See* 11 U.S.C. §363(b)(1).

### C. Once Liquidated, the Proceeds of Coastal's Liquidation Event Belonged to Coastal's Shareholder

Defendants have challenged many of the claims for relief under the theory that the Proceeds did not belong to the Debtor's bankruptcy estate. As explained herein, both the Proceeds and control

13

over them belonged to Coastal's lone shareholder by operation of the Amended Articles and California law. *See In re First Prot., Inc.*, 440 B.R. 821, 832 (B.A.P. 9th Cir. 2010) ("the bankruptcy court correctly found, as a matter of law, that Debtors' membership interests and contractual rights under the operating agreement became property of their estate"). A review of the Amended Articles reflects that the sale of the Wine Estate Property effectively served to liquidate Coastal and by definition constituted a defined Liquidation Event. SAC, Exh. 1, ART. II.B.2.(c)(i) (defining "Liquidation Event" as "a sale, lease, exclusive license or other disposition of all or substantially all of the assets, technology or intellectual property of the corporation").

In turn, the Amended Articles made clear that upon such Liquidation Event, the cash proceeds of that event belonged to the shareholders to be paid first to the preferred shareholders with any remaining corpus to be paid to the holders of common stock. *Id.*, ART. II.B.2(b) and ART. III.C.2. The Amended Articles provided no discretion to Coastal's Board to determine what to do with the Proceeds, unlike the discretion afforded the Board in the Amended Articles for non-liquidation events under the separate "dividend provisions" section. *Id.*, at ART. E II.B.1. The Babcock/Nobles Defendants, seeking to avoid the clear import of the Amended Articles with respect to a Liquidation Event, argue that "[i]t is undisputed that . . . Coastal was not liquidated prior to the subject transfers" (referring to the transfer of the Proceeds). Babcock/Nobles MTD, at 11:11-12. The Babcock/Nobles Defendants' MTD fails to acknowledge, let alone address, the defined Liquidation Event. The Oldfield Creely defendants alternatively argue that a Liquidation Event merely creates a priority scheme with respect to the Proceeds, not a right to the proceeds. Oldfield Creely MTD, at 6:13-15. Neither position is supported by the language of the Amended Articles.

Indeed, the language of the Amended Articles and the case authority provided by Defendants actually supports the Liquidating Trustee's position. Defendants cite *Miller v. McColgan*, 17 Cal. 2d 432 (1941), for the proposition that the shareholder "becomes ***the owner of a portion of each only when the corporation is liquidated*** by action of the directors ***or*** when a portion of the corporation's earnings is segregated and set aside for dividend payments on action of the directors in declaring a dividend. . .". (emphasis added). The former is what happened here. By definition, there was a Liquidation Event and, thus, the Debtor became the ***owner*** of the Proceeds upon the sale of the Wine

14

2792013

Estate Property. It did not require any discretionary action by Coastal's Board because the liquidation triggered the former situation. The Debtor's bankruptcy estate's purported expectancy became an ownership interest under California law and the Amended Articles when Coastal liquidated its only asset. *See also In re Pisculli*, 2009 WL 700059, at *3 and fn. 3 (Bankr. E.D.N.Y. Mar. 4, 2009) ("[o]nce the Debtor liquidated the Assets of [the wholly-owned non-debtor corporation], the Debtor had a direct interest in the Proceeds").

To be clear, the Amended Articles, like the *Miller* decision, differentiate between a discretionary dividend provided for in ART. III.B.1.(a), which entitlement to a dividend is only "when, as and if declared by the Board of Directors. . .," and the absolute entitlement of the shareholder to the proceeds from a Liquidation Event provided for in ART. III.B.2. The latter provisions do not merely provide for a priority as between preferred and common stock, but also for the mandatory distribution of the proceeds of a Liquidation Event to the shareholders. This provision even provides a method for distribution when the Liquidation Event results in the payment to the corporation of consideration other than cash. SAC, Exh. 1, pp. 55-56. Notably, the latter provisions relating to a Liquidation Event contain no requirement of a declaration by Coastal's Board; rather, it is the liquidation itself (consistent with *Miller*) that creates the shareholder's rights—*i.e.*, ownership interest in the proceeds.

Likewise, the Oldfield Creely and Babcock/Nobles defendants cite to *Nelson v. Anderson*, 72 Cal. App. 4th 111, 126 (1999) for the proposition that "[s]hareholders own neither the property nor the earnings of the corporation. Shareholders own only stock, from which their income is derived upon the liquidation of assets or the declaration of dividends by the directors. [Shareholder] had no ownership interest in the profits of [the corporation] and cannot have been deprived of them." See e.g., Backock/Nobles MTD, at 10:20-23. The Liquidating Trustee does not disagree with this statement of California law, it is the facts that do not fit squarely into Defendants' argument.

This is not the case where Coastal had earnings or profits from business operations upon which a dividend, at Coastal's Board's discretion, could be made. Rather, Coastal owned a singular asset, the Wine Estate Property, which was liquidated and, thus, created the shareholder's rights in the proceeds from the Liquidation Event. *See, e.g., Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d

15

2792013

381 (Del. 2012) (defined "Liquidation Event" would provide preferred shareholder with a preference distribution with any remainder to common shareholders, but no Liquidation Event occurred).

Here, the Debtor's bankruptcy estate's "income is derived upon the liquidation of assets"—the sale of the Wine Estate Property. As pled, the known legitimate debts were paid for in escrow on the sale of the Wine Estate Property, as well as one illegitimate debt purportedly owed to Med-Venture and, further, monies were subsequently paid for tax purposes (and then the subsequent illegitimate debt to Aurora Capital LLC). Even if taxes were owed as a result of the Liquidation Event, that does not change the fact that the Proceeds from that Liquidation Event are owned by the Debtor's bankruptcy estate as the lone shareholder of Coastal. Indeed, as alleged, the Debtor even overpaid Coastal's taxes in order to hide additional dissipated funds that he then received as a refund on the tax overpayment. SAC, ¶ 99. The Debtor clearly stood behind valid creditors at the time of the sale, whether paid for in escrow or at a later time when Coastal paid its taxes.

The Babcock/Nobles Defendants' argument—looking at the timing of when the last legitimate creditor, the IRS, was paid, as opposed to the amounts owed legitimate creditors—perverts the pleading. Babcock/Nobles MTD, at 12:6. The point made by the Liquidating Trustee is that the Debtor's bankruptcy estate is the owner of the Proceeds net of amounts due legitimate existing creditors at the time of the Liquidation Event (which would include any tax obligation on the sale). It matters not when the IRS is in fact paid but simply the fact that the Debtor's bankruptcy estate's ownership is net of what is owed to the IRS. Thus, the "after payment" was not designed to create a temporal element that neither exists under the law or in the Amended Articles, but simply to reaffirm that the shareholders' ownership interest is in the Proceeds.

As distorted by the Babcock/Nobles Defendants, the time period in which Coastal creates and files its tax returns and makes payment to the IRS on account of the Liquidation Event creates a grace period in which Coastal would be allowed to transfer the Proceeds. Under this argument, Coastal could withhold $1 from a legitimate creditor for years and use this failure to pay as a basis to transfer the Proceeds. That cannot be the law, as it would simply incentivize the very sort of fraudulent transfers that occurred here. Rather, while Coastal may not have been in a position to distribute the Proceeds until it determined the full extent of its then existing creditors (and,

16

specifically, the amount owed to the IRS), that distribution was due and owing as a result of the Liquidation Event and was not subject to any "discretion" of Coastal's Board. Those monies belonged to the shareholders as a result of the Liquidation Event.

Given that the Liquidation Event gave the Debtor's bankruptcy estate, as Coastal's sole shareholder, a direct right to the Proceeds derived from the liquidation of the Wine Estate Property, any use of the Proceeds by the Debtor could only be made with shareholder consent and after notice and a hearing before this Court pursuant to 11 U.S.C. § 363. Focusing solely on the Proceeds (and not on the Wine Estate Property sale in the first instance), while the payment of taxes resulting from the sale can be considered within the ordinary course, as alleged none of the other uses of the Proceeds fell within this exception in light of the character of these transactions and Debtor's own admission that no plan for the use of these monies had been created and approved by the shareholders even after these undisclosed transfers had already been made:

> The Board of Directors met informally about future operations of the company and that review is ongoing. The changing political climate and potential changes in the tax code may weigh heavily on future operations and decisions based on those changes will be delayed until the results are known. "The president was directed, with any other interested board member(s), to review options and present a plan to [] the next shareholder meeting in the spring." The president continues the process of creating such plan through investigation of investment options.

*Id.*, Exh. 5, p. 104.

Oldfield Creely also claims that Coastal continued to conduct business insofar as it purchased a property after the sale of the Wine Estate Property. Oldfield Creely MTD, at 7:1-2. As pled, the Debtor used some of the Proceeds to purchase a condominium in Coastal's name and did so without obtaining shareholder consent or Court approval. SAC ¶¶ 100-103. As alleged "[t]his transfer was itself a fraudulent, postpetition transfer which the Liquidating Trustee has separately recovered for the benefit of the Estate." ¶ 100. This was not evidence that Coastal was still operating but, rather, that the Debtor was transferring Proceeds that did not belong to him. *Id.* It would make little sense for the Liquidating Trustee to have sought approval to employ real estate brokers to sell the property in question [as Oldfield Creely points out, Oldfield Creely MTD, at 7:4-6], if Coastal owned the property free and clear of the Debtor's bankruptcy estate, just as it would have made no sense for the

2792013

1  Debtor's wife to revert the property back to the Debtor's bankruptcy estate if it was Coastal's

2  "operating" asset and not property of the Debtor's estate.

3       The Debtor was not free to dissipate the Proceeds from the Liquidation Event post-petition

4  without shareholder consent and without Court approval—as reaffirmed by 11 U.S.C. § 363—and as

5  he admitted. Moreover, this statutory provision does not distinguish between "substantially all" or

6  "all" of the Debtor's assets, but rather any asset of the estate is subject to the requirement of notice, a

7  hearing, and Court approval. Here, the Proceeds were by operation of the Amended Articles and as

8  a result of the Liquidation Event an asset of the Debtor's bankruptcy estate and, thus, Court approval

9  was required for any of the post-petition transfers of these Proceeds.

10       **D.**    **The Protections of Section 1001 and Section 363 Applied to the Sale of the Wine Estate Property and, thus, the Resulting Cash Proceeds from the Sale**

11
12       Defendants posit that the Court should look solely to the cash proceeds of the sale and if such

13  proceeds were dissipated through a series of transfers, as opposed to one large transaction, the Court

14  should find that these dissipations are not of all or substantially all of the Coastal's assets and,

15  therefore, fall outside of Section 1001. Not true. While the transfer of operating income during the

16  normal course of a company's operations pre-bankruptcy and where the corporation has other

17  operating assets may not animate this section, that is not what happened here. As *Jeppi* instructs, "a

18  corporation is organized for the purpose of doing business of some nature. . .". Coastal had one

19  asset, the Wine Estate Property. Its attempt to sell triggered Section 1001 and Section 363. The

20  Proceeds were not ordinary income from ongoing operations. The resulting Proceeds were merely

21  the product of the liquidation (*i.e.*, sale) of its lone asset. Coastal had no further business operations.

22  It cannot be the case that the Wine Estate Property was a singular asset, but the $7,000,000 in

23  Proceeds is 7,000,000 assets. Rather, there was but one corpus arising from the Liquidation Event,

24  the Proceeds, and any attempt to transfer, dissipate, or use this asset from the Liquidation Event

25  required shareholder consent and Court approval (especially in light of the express provisions of the

26  Amended Articles).

27       Oldfield Creely's reliance on *In re Liquimatic Systems, Inc.*, 194 F. Supp. 625, 629-630 (S.D.

28  Cal. 1961) serves only to disprove Defendants' arguments. *In re Liquimatic* did not involve the

18

2792013

liquidation of an entity or a defined Liquidation Event, let alone a post-petition transfer. Rather, this was an operating entity that manufactured devices for metering and storing liquid food products. This was a pre-bankruptcy transfer of $25,000, and the debtor carried on business (and had operating assets) for more than a year after this transfer. The court found that the creditors had not presented any evidence that the $25,000 "constituted all, or substantially all of the corporation's assets at the time of conveyance." *Id.* Here, in contrast, the Proceeds, like the Wine Estate Property before it, was the only asset of Coastal. This simply is not the situation where the Proceeds were but one asset (in the form of operating income) of an otherwise operating entity. Rather, it was the corpus remaining after liquidation of Coastal's sole asset.

The Babcock/Nobles Defendants similarly argue that the Proceeds should be viewed not as a singular asset but as individual assets. But whether the Debtor gave $7,000,000 to one entity or through a series of transactions gave the $7,000,000 to more than one entity should not matter, as they were all done post-petition under a single scheme and singular goal of defrauding creditors and this Court, as reflected in the materially misleading periodic reports filed by the Debtor with the Court. SAC, Exhs. 2-5. Moreover, as demonstrated above because Coastal had no further operations, not only did the Proceeds belong to the Debtor's bankruptcy estate as the lone shareholder, but so too did control over their use and animated the application of 11 U.S.C. § 363(b).

Further to this point, the sale of the Wine Estate Property clearly falls within the parameters of Section 1001. Defendants point out that the Liquidating Trustee does not seek rescission of that sale, but that does not change the nature of the sale, which was a sale of ***all*** of the Debtor's assets (the Wine Estate Property). Defendants believe that the Liquidating Trustee must allege that each subsequent dissipation of the Proceeds was, standing alone, a transfer of all or substantially all of Coastal's assets. The sale of the Wine Estate Property required shareholder consent and because it was consummated after the Debtor filed for bankruptcy, court approval. No such shareholder consent or Court approval was sought or obtained. Thus, any further action with respect to the Proceeds of this otherwise unapproved act would be subject to the same proscription. Indeed, the Court previously rescinded the Debtor's attempt to merge Coastal, a California corporation, into a newly created Delaware corporation. The basis for that ruling was that the shares of the California

19

2792013

corporation could not be used without Court approval, which approval was neither sought nor

obtained.  SAC, Exh. 6, pp. 120-121.  If the merger was subject to being undone, then so too any act

subsequent to that committed by the Delaware corporation before the matter was raised with the

Court would also be subject to being undone.  These subsequent acts would all be tainted by the

failure to obtain Court approval in the first instance.

Here, since the Debtor did not have authority to sell the Wine Estate Property in the first

instance it did not have authority to then dissipate the resulting Proceeds therefrom absent

shareholder consent and Court approval.  Under both Section 1001 and Section 363, the Liquidating

Trustee has standing to unwind (rescind) those subsequent transfers.  *See Bank of New York Mellon

v. 251 Gotham LLC*, 604 B.R. 71, 77 (Bankr. S.D. Ala. 2019) (quoting *In re Zeman*, No. 09-52559-

C, 2010 WL 3123144, at *2 (Bankr. W.D. Tex. Aug. 6, 2010) ("If a debtor, acting with the powers

of a trustee, disposes of property out of the ordinary course of business without prior court approval,

then the transaction may be unwound as invalid."); *see also, e.g.*, *In re DeRosa-Grund*, 544 B.R.

339, 367-68 (Bankr. S.D. Tex. 2016) (transfer of property of estate without court approval was

void); *In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 379 (Bankr. N.D. Okla. 2004) (stating in

the context of § 363(b) that "[t]ransactions requiring, but lacking, approval may be set aside as

void"); *United States v. Goodstein*, 883 F.2d 1362, 1366-67 (7th Cir. 1989) (transfer of property in

bankruptcy without notice to creditors or bankruptcy court approval under § 363(b) could be deemed

fraudulent transfer of property of estate under criminal bankruptcy fraud statute).

The Nobles/Babcock Defendants assert that Section 549(c), which limits a trustee's

avoidance powers as against a purchaser of real property, served somehow to protect the defendants.

However, Section 549(c) is not applicable because, among other reasons, the transfer at issue is not a

transfer of real property.  In *In re Williams*, 104 B.R. 296, 298 (Bankr. C.D. Cal. 1989), a bankruptcy

court rejected this argument when made by the IRS in connection with a motion for summary

judgment on the chapter 7 trustee's claim under Section 549 to avoid and recover the transfer of

proceeds from the unauthorized, postpetition sale of real property made without court approval:

> Section 549(c), which protects a good faith purchaser of real property, does
> not apply because the res at issue was personal property in the form of cash
> proceeds and was not real property. *See* 4 *Collier on Bankruptcy* ¶ 549.03[1]
> at 549–9 to –10 (15th ed. 1989). In addition, Section 549(c) does not apply

> because the IRS was not a good faith purchaser of the funds. *See* § 101(37) (definition of purchaser). Even if the IRS were a good faith purchaser, "[n]o protection is provided for a good faith purchaser of personalty other than under section 549(b)." 4 *Collier on Bankruptcy* ¶ 549.03[3] at 549–12.

*Williams*, 104 B.R. at 298. For the same reasons stated in *Williams*, Section 549(c) does not insulate the defendants from liability in this action. The Nobles/Babcock Defendants further argue that the Liquidating Trustee cannot avoid the transfers of the Proceeds because the Liquidating Trustee has not sought to avoid the sale of the Wine Estate Property. However, the Liquidating Trustee's ability to avoid the transfers of the Proceeds under Section 549 is not contingent on the avoidance of the sale of the Wine Estate Property. *See Williams*, 104 B.R. at 298 (finding that the transfer of proceeds from an unauthorized, postpetition sale of real property was avoidable by the chapter 7 notwithstanding that chapter 7 trustee did not seek avoidance of the sale of the real property).

In any event, that would be a defense to the Liquidating Trustee's claims, which is not a reason to dismiss the SAC on a Rule 12(b)(6) motion. Whether or not the Defendants have a defense to the Liquidating Trustee's claims is not the proper inquiry at the motion to dismiss stage. Rather, when the Court takes the factual allegations in the SAC as true, as the Court must do when ruling on a 12(b)(6) motion, the SAC sufficiently states a claim that is plausible on its face that the Proceeds were property of the Debtor's estate.

### E. The Second Claim for Relief Adequately States a Claim for Recission

The Nobles/Babcock Defendants and JRG argue that the SAC fails to state a claim for rescission under Section 1001 because they assert that the Liquidating Trustee did not promptly bring the claim. The promptness argument was rejected already by the Court in the context of the defendants' prior statute of limitations argument. *Infra*, section IV.I. The Liquidating Trustee has pursued the return of the monies with due dispatch.

### F. The Fact that Oldfield Creely Was Paid with Proceeds that Belonged to the Debtor's Estate without Obtaining Court Approval While Performing Work for a Third Party Only Serves to Demonstrate that the Debtor Received No Benefit

Oldfield Creely argues that the SAC should be dismissed as to it because it did not represent Debtor in connection with the bankruptcy case. As discussed above, the SAC sufficiently pleads facts to establish that the Proceeds are property of the estate, and Oldfield Creely was paid with

21

2792013

estate funds. Pursuant to Fed. R. Bankr. P. 2016(a), a person seeking compensation from the estate must file an application with the Court. *See In re Baker*, 68 B.R. 360, 365 (D. Or. 1986). At all relevant times, the Proceeds were property of the estate. SAC, ¶ 5. Oldfield Creely never filed an application to be employed by the estate and it did not receive Court approval for payment of any of its fees, yet was paid over $200,000 in estate property for its services. SAC, ¶¶ 171.

Oldfield Creely also argues, without citation to the SAC or any judicially noticeable facts that some of the Proceeds belonged to Chateau Julien. Oldfield Creely MTD, at 6:10-11. At the pleading stage, Oldfield Creely's conjecture is not subject to consideration. In point of fact, the only allegation in the SAC is that Chateau Julien's assets were all transferred to Coastal. SAC, ¶ 81. There is no allegation that any money was owed to Chateau Julien in the SAC or that Chateau Julien was a party to the sale of the Wine Estate Property with rights to any of the Proceeds. Thus, there is no basis for Oldfield Creely's speculation that any of the Proceeds belonged to Chateau Julien.

### G. As Counsel for the Debtor-in-Possession, JRG Needed Court Approval or Faced Disgorgement

> It is well established that the penalty for failure to be employed as counsel or satisfy the code's requirements is disallowance or disgorgement of fees paid to counsel. *See In re Monument Auto Detail*. It's a Ninth Circuit BAP decision, 226 B.R. 219, and a quote from that is, "Court approval of employment of counsel for debtor-in-possession is the *sine qua non* to counsel getting paid. Failure to obtain court approval of a professional in accordance with the Bankruptcy Code and rules precludes payment of fees." In addition, *In re Woodcraft Studios*, 464 B.R. 1, it's a 2011 decision from the Northern District of California, states, "The Bankruptcy Court did not abuse its discretion in denying fees and ordering disgorgement of a retainer for attorney's nondisclosure."

Dkt No. 126, at p. 28 and 29 of 37. Here, as alleged, JRG was paid over $280,000 of the Debtor's Proceeds without having its representation approved by the Court.

### H. JRG's Representation of Conflicting Interests is Not Subject to the Litigation Privilege and Can Form the Basis for a Malpractice Claim

The California Rules of Professional Conduct prohibit an attorney from representing in the same litigation parties with adverse interests without informed written consent. Cal. Rule Prof. Cond. 1.7; *see also* Cal. Rule Prof. Cond. 3-301(b) (in effect until October 1, 2018). A malpractice action will lie against counsel that violates his or her fiduciary duty of loyalty, which action is not subject to the litigation privilege set forth in Section 47(b) of the California Civil Code:

22

> Section 47(b) . . . provides in relevant part that "[a] privileged publication or broadcast is one made ... [i]n any ... judicial proceeding ... or in initiation or course of any [such proceeding]" Regarded by many courts as absolute in nature, it applies not only to statements made during a trial or other proceeding, but also to steps taken prior thereto or afterwards.
>
> As a general rule, however, the privilege applies only to communicative acts, such as lodging a filing or sending a demand letter, not to tortious conduct. The distinction between communicative and noncommunicative conduct hinges on whether the injury allegedly resulted from an act that was "communicative in its essential nature."
>
> Here, plaintiffs' claims against KLG center around tortious conduct, from which privilege communications incidentally flowed. KLG's averred missteps were not inherent to the communications it rendered to drive the course of the bankruptcy proceeding, but rather its failure to refrain from engaging in a conflict of interest and favoring TVC's interests to Opus's detriment. Indeed, a key purpose of the litigation privilege is to promote access to the courts and to encourage witnesses to testify truthfully without the fear of retaliatory lawsuits. Applying it to shield attorneys from allegations of malpractice, however, would not further this purpose.

*Siegal v. Gamble*, 2015 WL 3660204, at *3-*4 (N.D. Cal. June 12, 2015) (citations omitted); *see also Estakhrian v. Obenstine*, 233 F. Supp. 3d 824 (C.D. Cal. 2017). It is the conflicted representation itself, not the statements counsel made to the Court, that is actionable.

Further, JRG owed a separate fiduciary duty to Debtor's bankruptcy estate as JRG was representing the debtor in possession in the Enhancement Action. *In re Count Liberty, LLC*, 370 B.R. 259, 280-81 (Bankr. C.D. Cal. 2007) (collecting cases). "While counsel's duty to the estate may not rise to the level of a policeman for the debtor's post-petition conduct, an attorney for the debtor in possession has fiduciary obligations to the estate stemming from his fiduciary duties to the debtor in possession and his responsibilities as an officer of the court." *Id.* at 281–83. "Counsel is charged with the duty to advise the debtor in possession of its responsibilities under the Code, and to assist the debtor in possession, and its principals, in discharging those responsibilities." *Id.* "A debtor in possession's attorney bears a heightened duty of care 'to ensure [the] integrity of the bankruptcy process where, by definition, a debtor in possession is not disinterested, [and] counsel for a debtor in possession must be disinterested, free of any adverse entanglements which could cloud its judgment respecting what is best for the estate.'" *Id.* (quoting *In re JLM, Inc.*, 210 B.R. 19, 26 (B.A.P. 2d Cir. 1997)); *see also In re Whitney Place Partners,* 147 B.R. 619, 620–21 (Bankr. N.D. Ga. 1992) (stating that "the debtor's attorney must take conceptual control of the case and provide

23

guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided").  As *Count Liberty* instructs: "When counsel fails to act diligently to ensure that the debtor in possession's management protect the estate from dissipation, the court may order a reduction, denial or forfeiture of compensation in the case."  *Count Liberty, LLC*, 370 B.R. at 287 (collecting cases).  This is exactly what the Liquidating Trustee seeks in the SAC by seeking damages in the amount of fees paid to JRG.

As alleged in the SAC ¶¶ 215-18, JRG breached this duty by failing to: (i) file an application to be employed by the estate; (ii) receiving payment of its fees without Court approval; (iii) failing to disclose the terms of its representation; (iv) representing the defendants in the Enhancement Action even though such representation was a conflict of interest; and (v) failing to properly advise the Debtor of his duties under the Bankruptcy Code as a debtor in possession.  These allegations sufficiently plead a claim against JRG for breach of fiduciary duty.

JRG argues that the Court has previously rejected the Liquidating Trustee's claims for breach of fiduciary duty.  This is patently false.  The November Decisions that JRG cites relates to the claim in the original complaint for aiding and abetting breach of fiduciary duty, which is a completely separate claim with its own elements that must be met.  The Court has never ruled on the bona fides of the claim for breach of fiduciary duty.

## I.     The Court Rejected the Statute of Limitations Argument; JRG's Attempt to Claim that the Trustee Has Not Acted Promptly Is Belied by the Plan

Oddly, JRG seek judicial notice of the Court's Transcript of Proceedings dated November 18, 2021 [Doc. No. 123] regarding the application of the statute of limitations to these claims, arguing that the Court did not previously address this issue. To the contrary, the Court rightfully rejected this argument, as follows:

> The second global issue is whether claims are time-barred.  ***I find that as to the motions to dismiss, plaintiff's claims are not time-barred.***  The liquidating trust was created in connection with confirmation of a plan in debtor's Chapter 11 case.  The liquidating trust agreement specifically provides that the liquidating trustee will not have authority over the causes of action on the confirmation date. The liquidating trustee only has authority if and when the effective date occurs. The plan contemplates survival of all causes of action through the effective date for the benefit of the liquidating trust and its beneficiaries.

24

2792013

Dkt. No. 126, at p. 28 of 37 (emphasis added).

Ignoring the Court's prior finding, JRG also argues that the Court-approved Plan could not toll the statute of limitations for purposes of claims to be pursued by the estate. JRG argues that a chapter 11 plan cannot suspend the statute of limitations "where the parties whose rights are impacted received no notice and no opportunity to object to the limitation of their rights." JRG MTD, 8:25-27. The relevant case law is directly contrary to JRG's argument that they were entitled to notice that a bankruptcy trustee could avoid the transfers to it. *See*, *e.g.*, *In re Redf Mktg., LLC*, 536 B.R. 646, 655 (Bankr. W.D.N.C. 2015) (finding that transfer avoidance defendants were not entitled to notice of the bankruptcy proceedings); *In re S. Indus. Banking Corp.*, 66 B.R. 349, 361 (Bankr. E.D. Tenn. 1986) ("Formal notice of bankruptcy proceedings to potential preference defendants has never been customary and perhaps never considered previous to this case. This court is confident that neither Congress nor the Bankruptcy Rules Committee envisioned formal notice of bankruptcy proceedings to transferees of avoidable transfers or their participation in reorganization proceedings until disgorgement of the avoidable transfer.").

Even assuming the Court accepts JRG's notice argument, JRG had actual knowledge of the Debtor's bankruptcy case because it was representing the Debtor, among others, in the Enhancement action, which was filed prior to confirmation of the chapter 11 plan. *See SAC*, ¶¶ 19, 62, 163. As JRG had actual knowledge of Debtor's bankruptcy case, JRG was on inquiry notice that it was required to file an application to be employed by the estate prior to receiving payment of its fees from estate property. *E.g.*, *In re Coastal Alaska Lines, Inc.*, 920 F.2d 1428, 1430–31 (9th Cir. 1990).

**V. CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny the Motions.

DATED: May 23, 2022                     BG LAW LLP

By: _____
     Jason B. Komorsky
     Jessica L. Bagdanov
     Jessica S. Wellington
     Attorneys for Michael G. Kasolas, Liquidating Trustee
     For the Robert Brower, Sr. Liquidating Trust

25

2792013

<u>**CERTIFICATE OF SERVICE**</u>

I, NIKOLA A. FIELDS, certify that service of following document:

**PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6) [DOCS. 110, 113 & 124]**

was made on May 23, 2022 by:

☒ Mail Service: Regular, first class United States mail, postage fully pre-paid, addressed to:

**SEE ATTACHED LIST**

☒ Notice of Electronic Filing (NEF): The foregoing document will be served by the court via NEF and hyperlink to the document. I checked the CM/ECF docket for this case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Jessica L. Bagdanov**    jbagdanov@bg.law, ecf@bg.law
- **Jason B. Komorsky**    jkomorsky@bg.law, ecf@bg.law
- **Ryan O'Dea**    rodea@shbllp.com
- **Aron M. Oliner**    roliner@duanemorris.com, dmicros@duanemorris.com
- **Rogelio Serrano-Gutierrez**    rserrano@kdvlaw.com
- **Wendy W. Smith**    Wendy@bindermalter.com
- **Jessica Wellington**    jwellington@bg.law, ecf@bg.law

☐ Overnight Delivery: By enclosing in a UPS envelope for next day delivery.

☐ Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail addresses to the following officer of the defendant at:

☐ Email: The defendant's counsel was served by email as follows:

If service was made by personal service, by residence service, or pursuant to state law, I further certify that I am, and at all times, during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made.

Under penalty of perjury, I declare that the foregoing is true and correct.

Date: May 23, 2022

_/s/ Nikola A. Fields_
NIKOLA A. FIELDS

Brutzkus Gubner
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367

**VIA REGULAR FIRST CLASS MAIL**

Patricia Brower, PRO SE
2 Christopher Court
Flanders, NJ 07836

Great American Wineries, Inc., PRO SE
Attn: Robert Brower Jr.,
Agent for Service of Process
28088 Barn Court
Carmel, CA 93923

Great American Wineries, Inc., PRO SE
c/o Robert Brower Jr., President
2511 Garden Road, Suite B-100
Monterey, CA 93940

Deerleaf Holdings, Inc., PRO SE
c/o United States Corporation Agents, Inc.
221 N BROAD ST, SUITE 3A
Middletown, DE 19709

Deerleaf Holdings, Inc., PRO SE
c/o Robert Brower Jr., President
25 Sunderland Lane
Katonah, NY 10536

Robert Brower, Jr., PRO SE
25 Sunderland Lane
Katonah, NY 10536

Med-Venture Investments, LLC
c/o Ryan O'Dea
**VIA NEF**

Anthony Nobles
c/o Ryan O'Dea
**VIA NEF**

Aurora Capital Advisors
c/o Ryan O'Dea
**VIA NEF**

Richard Babcock
c/o Ryan O'Dea
**VIA NEF**

Oldfield Creely, LLP
c/o Rogelio Serrano-Gutierrez
**VIA NEF**

Pohanka of Salisbury, Inc.
Attn: Neal Johnson, agent for service of process
1772 Ritchie Station Court
Capitol Heights, MD 20743

Pohanka of Salisbury, Inc.
Attn: Paul Eaton, Chief Operating Officer
2013 North Salisbury Blvd.
Salisbury, MD 21801

Johnson, Rovella, Retterer, Rosenthal
 & Gilles, LLP
c/o Wendy Smith
**VIA NEF**

Pohanka of Salisbury, Inc.
c/o Ron Olinor, Esq.
Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127